**Robert Lee JENKINS and Harvey E. Jenkins, Plaintiff In Error,**

**v.**

**STATE of Tennessee, Defendant In Error.**

Court of Criminal Appeals of Tennessee.

Jan. 3, 1974.

Certiorari Denied by Supreme Court
April 15, 1974.

Hal H. Carr, Blountville, Thomas Mc-Kinney, Jr., Kingsport, for plaintiff in error.

David M. Pack, Atty. Gen., Phillip W. Brooks, Asst. Atty. Gen., Nashville, Carl K. Kirpatrick, Dist. Atty. Gen., Kingsport, for defendant in error.

## OPINION

OLIVER, Judge.

Following the killing of Newman Christian on November 28, 1971, Robert Lee Jenkins was indicted for first degree murder, and in a separate indictment Harvey E. Jenkins was charged with aiding and abetting Robert Lee Jenkins in the murder of Christian. Jointly tried in the Criminal Court of Sullivan County, Robert Lee Jenkins was convicted of second degree murder and sentenced to imprisonment in the penitentiary for not less than 10 nor more than 20 years, and Harvey E. Jenkins was convicted of aiding and abetting murder in the second degree and sentenced to 10 years in the penitentiary. Each has duly perfected an appeal in the nature of a writ of error to this Court.

By appropriate Assignments of Error, both defendants raise the usual challenge to the sufficiency of the evidence to warrant and support the verdicts of the jury. We summarize the material evidence.

On the night of November 27, 1971, Roy Morelock and two other men went to a bootlegging establishment where the defendant Robert Lee Jenkins, who was in charge, and Hugh Laughlin (or Lawson) were involved in an argument over Jenkins' refusal to sell Laughlin beer. When Morelock offered to buy the beer for Laughlin (with the latter's money), Jenkins took exception and pulled a gun on Morelock and told him to leave, grabbed him by the collar and jerked him across a half door and struck him on the head.

About noon the following day, which was Sunday, after driving Newman Christian's father to Bristol, Morelock and Christian decided to go to Gallatin, Tennessee. After stopping to buy 12 bottles of

beer and a box of .38 caliber cartridges for Christian's revolver, they decided to go to the same bootlegging establishment to buy some liquor because they did not want to try to buy any in a strange town on Sunday, and Morelock did not think Robert Lee Jenkins would be there since he had worked the night before. Enroute to that establishment, Morelock and Christian each drank a beer.

Robert Lee Jenkins was in the establishment when Morelock and Christian arrived. Morelock said to him, "I don't appreciate you busting my head like that." At that time or shortly before, Christian returned to the car. Harvey E. Jenkins came from another room with a shotgun and ordered Morelock to leave, and Robert Lee Jenkins pulled a .38 caliber revolver and told Morelock it was "about time to go." Morelock said, "No trouble" and went outside and started to his car. When he was two or three steps beyond the porch, about half way to his car, he heard one of the defendants say, "Why don't we just kill that son of a bitch going there?" He then heard a gun fire and a rattling sound "like you throw a handful of gravels at something." Later investigation showed that a large number of shotgun pellets struck the left side of Morelock's car near the bottom. Turning around, Morelock saw both of the defendants, Harvey E. Jenkins with a shotgun and Robert Lee Jenkins pointing a revolver at him. Christain was standing on the other side of Morelock's car. Morelock described it: "Well one arm was laying sort of like on top of this car, right here, and the other one, you know, was sort of hung over, like this way, just raised up out of the car." As Morelock started to run, another shot was fired. Blood appeared instantly on Christian's face, he stood for a second and then collapsed. It was stipulated that he died from a .38 caliber gunshot wound in the head. Morelock testified that Christian did not have a gun in his hand when he was shot. The police found the deceased's gun 18 inches from his hand, fully loaded.

In Morelock's car the officers found one empty beer can and one empty beer bottle, and a box of .38 caliber cartridges with 13 missing. Morelock testified that some of the cartridges fell down into the rotting carpet of his car, and that enroute to the bootlegging establishment he and the deceased fired a couple of shots each into the floorboard of his car. A police officer testified that Morelock and Harvey E. Jenkins appeared to have been drinking.

The defendant Robert Lee Jenkins testified that on the night of November 27, 1971 he declined to sell any beer to Morelock and another man who came to the house and told them to leave; that Morelock began arguing and "he reached in there to unbolt my door, and when he did, I hit him in the head with a pistol"; that Morelock got into his car and "hollered that he'd be back"; that the next afternoon, Sunday, Morelock and Christian came in and asked for two cans of beer, which he refused to sell them; that Morelock said, "I don't appreciate you hitting me in the head. I could have got a warrant for you, but I brought my warrant with me"; that he replied to Morelock, "Well, I don't appreciate you being here. I told you to stay away"; that Christian then left, taking a gun from his pocket, and Morelock said "My name's Roy Morelock" and that he replied, "That's nothing, mine's Robert Jenkins. You just go on. I don't want no trouble with you. I told you last night not to come back here"; that Morelock then went outside, and turned around after going down the steps and said, "Wait a minute, let's get this straight now"; that he stepped out on the porch and "I told him, I said 'Go on,' and I looked up and I was looking right in the barrel of Tiny Christian's pistol, aimed at me over the top of the car"; that "I just up and fired and fell on the porch," and Morelock ran and Christian disappeared behind the car; that he fired only once because "That man was going to kill me";

that after he fired his brother (Harvey E. Jenkins) came outside; and that he did not have anything to drink that night. On cross-examination, both by Harvey E. Jenkins' counsel and the District Attorney General, he testified that he had already shot the deceased before Harvey came out on the porch with a shotgun and fired into the side of Morelock's car, and at that time Morelock was somewhere down at the side of the house, and he didn't know what Harvey was shooting at.

The defendant Harvey E. Jenkins testified he had been staying at his brother's (Robert Jenkins) house a few days; that around 1:00 a. m. the night of November 27, 1971 a man who gave his name as Lawson (as Harvey understood it) began kicking on the door; that his brother Robert Jenkins opened the top half of this Dutch door and told Lawson he could have used the door buzzer; that Lawson said he wanted some beer and wanted to come inside; that, because it was after hours for beer sales, Robert told Lawson he could not come in; that a short time later Lawson and Morelock returned and kicked on the door and Morelock asked Robert Jenkins why he was giving his friend a rough time; that Morelock, Lawson and Robert Jenkins began arguing, and as Morelock reached over the closed bottom half of the door, Robert Jenkins hit him in the head with a pistol; that as they left, Morelock said he would be back; that the next afternoon Morelock and the deceased came to the house; that from where he was sitting in a back room, he could see a pistol in the deceased's pocket; that Morelock, the deceased and Robert Jenkins argued; that he got the shotgun from under the mattress in a bedroom, and when he returned the deceased and Morelock and Robert had gone outside; that he then heard a shot and saw Robert go down, and when he got outside he saw Robert getting up, and saw no one else except Morelock walking pretty fast down along the side of the building; "Well, when I see that, well, there's nothing to shoot at," and that he did not intend

to shoot at Morelock or anyone else "unless they'd been shooting towards me, or been aiming at me or my brother," and the shotgun was accidentally discharged as he undertook to uncock it.

■ Tested by the time-honored and oft-repeated rules governing appellate review of evidence in criminal cases when, as here, its legal sufficiency is challenged on appeal, to which we must adhere, Jamison v. State, 220 Tenn. 280, 416 S.W.2d 768; Webster v. State, 1 Tenn.Cr.App. 1, 425 S.W.2d 799; Chadwick v. State, 1 Tenn.Cr.App. 72, 429 S.W.2d 135, in our judgment the material evidence in this case unquestionably justified the jury in finding the defendant Robert Lee Jenkins guilty of second degree murder and amply supports that verdict, and also supports the verdict finding Harvey E. Jenkins guilty of aiding and abetting that homicide.

TCA § 39–109 defines aiders and abettors:

"All persons present, aiding and abetting, or ready and consenting to aid and abet, in any criminal offense, shall be deemed principal offenders, and punished as such."

According to Harvey E. Jenkins' own testimony he was present and went out on the porch with a cocked shotgun ready and intending to shoot at anyone "aiming at me or my brother." Thus, he was "present, aiding and abetting, or ready and consenting to aid and abet" in the homicide. The jury very evidently believed Morelock's testimony that the shotgun blast preceded the pistol shot, and did not believe the defendants' story that Robert had already fired the fatal shot before Harvey came out on the porch and that the shotgun was only then discharged accidentally.

In 22 C.J.S. Criminal Law § 85, pp. 250–251, it is said:

"A principal in the second degree, or an aider and abettor as he is frequently called, is one who is present actually or

constructively, aiding and abetting in the commission of the felony; one who so far participates in the commission of a crime as to be present for the purpose of assisting therein, if necessary; one who gives aid and comfort, or who either commands, advises, instigates, or encourages another to commit a crime; one who aids and abets the actual commission of a felony by some degree of assistance or encouragement, whether or not present at the place of perpetration; a person, who, by being present, by words or conduct, assists or incites another to commit the criminal act.

\* \* \* \* \* \*

"Accordingly, in order that one may be a principal in the second degree or aider and abettor, the general rule is that it is essential that there be a crime committed and a principal in the first degree, and it must be shown that the person for whom accused was acting was connected with the offense. One cannot be an aider and abettor of himself in the commission of an offense; and where only one person is indicted for a felony, he cannot be convicted of aiding and abetting in the commission of the crime charged, but where two or more persons are jointly indicted as principals, any one of them, although tried separately, may be convicted of aiding and abetting."

It is also said in 22 C.J.S. Criminal Law § 87, pp. 255–258:

"In order to aid and abet another to commit a crime, it is necessary that accused in some sort associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree; the same criminal intent must exist in the minds of both. There must be a community of unlawful purpose at the time that the act is committed, . . .

". . . The common purpose need not be to commit the particular crime which is committed; if two persons join

in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal, if the other commits that particular crime, but he is also guilty of any other crime committed by the other in pursuance of the common purpose, or as a natural or probable consequence thereof."

And in 22 C.J.S. Criminal Law § 88(1), pp. 260–261:

"All persons who are actually or constructively present at the time and place of a crime, whether it is a felony or merely a misdemeanor, and who either actually aid, abet, assist, or advise its commission, or are there with that purpose in mind, to the knowledge of the party actually committing the crime, are guilty as principals in the second degree or aiders and abettors or as 'principals' under applicable statute, although they did not themselves accomplish the purpose. Conduct which amounts to aiding and abetting of the crime by accused at the time and place of its commission is, however, essential to guilt as a principal in the second degree or aider and abettor."

See also: Presley v. State, 161 Tenn. 310, 317, 30 S.W.2d 231.

■ Robert Jenkins' defense of self-defense presented a question for the exclusive determination of the jury. McGill v. State, Tenn.Cr.App., 475 S.W.2d 223; Arterburn v. State, 216 Tenn. 240, 391 S.W. 2d 648; May v. State, 220 Tenn. 541, 420 S.W.2d 647. Quite evidently the jury accepted Morelock's account of this killing and rejected this defendant's theory that he acted in his own necessary self-defense in killing the deceased and has resolved that question against him. Considering the fundamental rule that the jurors are the sole and only judges of the evidence, and of the weight to be given to the swearing of each and every witness in the case, and that the credibility of the witnesses and the weight and value of their testimony are matters entrusted exclusively to the jury as

the triers of the facts, Bailey v. State, Tenn.Cr.App., 479 S.W.2d 829; Gordon v. State, Tenn.Cr.App., 478 S.W.2d 911, and cases therein cited, upon this record we cannot say that the jury erroneously decided that issue.

Both defendants next complain that the court erred in excluding from the evidence an autopsy report showing the alcohol concentration in the deceased's blood. Upon cross-examination counsel for the defendant Robert Lee Jenkins elicited from a Kingsport police officer who investigated the homicide, and who was called as a prosecution witness, that the pathologist gave him a report made by the laboratory of the Holston Valley Community Hospital showing the deceased was drinking, and asked the witness to file that report as an exhibit to his testimony. The court sustained the State's objection on the ground that such evidence was hearsay. There was considerable contentious discussion about the autopsy report with reference to the analysis of the deceased's blood. After the jury retired for deliberation upon its verdict, a Xerox copy of a document entitled "Provisional Anatomical Diagnosis, Holston Valley Community Hospital, Kingsport, Tenn.", obviously made by the pathologist and which described the deceased's wound and stated that a blood sample was sent to the State Laboratory for toxicologic examination, was admitted on motion of Robert Lee Jenkins' counsel. Then, on motion of the State, a Xerox copy of the pathologist's autopsy report, in which the body of the provisional report just referred to was copied, and which included a finding that the deceased had a blood alcohol level of "224 gms.%", was also admitted.

■ In our judgment the defendants' complaints about alcohol in the deceased's blood are without substance, because such evidence was wholly irrelevant and immaterial to any issue in the case. Plainly, the amount of alcoholic beverage the deceased may have consumed and its effect upon him could not be raised as a matter of de-

fense by either of the defendants, in the context of this record and under their theory of the case. There is nothing in this record to show that he ever spoke a word to either of them, or that anything he may have had to drink beforehand affected him in any way or precipitated the events culminating in his death.

There is no merit in Harvey E. Jenkins' complaint that the court erred in permitting the State to elicit from him on cross-examination that he had been convicted previously of crimes involving moral turpitude, larceny and burglary, because the State failed to show those convictions were recent.

■ Of course, when a defendant takes the witness stand in his own behalf in the trial of a criminal case, he subjects himself to the same rules applicable to other witnesses and may be impeached in the same manner as any other witness. Brooks v. State, 187 Tenn. 67, 213 S.W.2d 7; Powers v. State, 117 Tenn. 363, 97 S.W. 815; Hill v. State, 91 Tenn. 521, 19 S.W. 674; Turner v. State, 89 Tenn. 547, 562, 15 S.W. 838; Peck v. State, 86 Tenn. 259, 6 S.W. 389; Morgan v. State, 86 Tenn. 472, 7 S.W. 456.

■■ Upon cross-examination, for purposes of impeaching his credibility as a witness, the defendant may be interrogated as to whether he was convicted previously of offenses involving moral turpitude. McGee v. State, 206 Tenn. 230, 332 S.W.2d 507; Jones v. State, 197 Tenn. 667, 277 S.W.2d 371. Larceny and burglary are such offenses.

■ But the jury should be instructed to consider impeaching testimony as affecting only his credibility as a witness, and not as impairing the presumption of innocence. Hill v. State, supra; Peck v. State, supra; Morgan v. State, supra.

Before permitting this defendant to answer the State's questions about his previous convictions, the court interrupted to

instruct the jury that "you cannot consider previous conviction of felonies as in anywise showing the guilt of the defendants on any charge, or in anywise weakening the presumption of innocence of the defendants on these charges, but you can only consider it in weighing their credibility as witnesses." Additionally, in the formal instructions to the jury the court charged:

"If there is evidence that the defendants, Robert Jenkins and Harvey E. Jenkins, had been previously convicted of a felony involving moral turpitude, you cannot consider that as in anywise showing the defendants guilty of the offenses charged in the indictment, or as anywise weakening the presumption of innocence of the defendants on these charges. You can only consider this in weighing their credit as a witness and for no other purpose."

But one qualification of the rules just stated is that the acts inquired about must not be too remote in time. In Cooper v. State, 123 Tenn. 37, 144, 138 S.W. 826, 854, the Court said:

" . . . The authorities are to the effect that inquiry into transactions so ancient should not be permitted by the trial judge for the purpose of impeaching the credibility of a witness, since it is to the interest of society that men reform, and live down their past, if an evil one, and the witness stand should not be made a place of torture, for probing into occurrences long forgotten, and perhaps forgiven before forgotten, and for dragging them forth anew, to the distress of the person who is subjected to the ordeal, and to the injury of the public morals."

In the present case, however, this defendant makes no claim that his past convictions were so remote as to cast no light on his present credibility. Clearly, then, he cannot claim upon any basis reflected by this record that he was prejudiced by having it brought out during his cross-examination that he had been convicted of larceny and burglary.

Harvey E. Jenkins next complains about the court's charge to the jury. When the jury returned into open court to report their verdicts in these cases, in response to the court's inquiry as to Harvey E. Jenkins' case the jury foreman reported the jury had found him guilty as an aider and abettor in second degree murder and fixed his punishment at five years. The court then further instructed the jury as follows:

"You have reported to the Court that in Case No. 6393–BL, you find the defendant, Harvey E. Jenkins, guilty as an aider and abettor of murder in the second degree and fix his punishment at five (5) years. The Court is unable to accept this verdict as the punishment for murder in the second degree is a range of not less than ten (10) years, nor more than twenty (20) years, and if a person aids and abets in the commission of a felony the punishment must be within the range as established by the Legislature for the offense. Therefore, the Court must ask—request that you return to the jury room to further deliberate in Case No. 6393–BL."

After additional deliberation the jury returned into open court and reported the same verdict as to guilt and fixed punishment at 10 years.

Of course, a verdict fixing punishment below the statutory minimum for the offense of which the defendant is found guilty is a nullity. Daniels v. State, 176 Tenn. 181, 140 S.W.2d 148; Mayfield v. State, 101 Tenn. 673, 49 S.W. 742; Murphy v. State, 47 Tenn. 516. Patently, therefore, the court could not accept the jury's verdict fixing punishment at five years in the penitentiary, because aiders and abettors are deemed principal offenders and are subject to the same punishment. TCA § 39–109. Second degree murder is punishable by imprisonment in the penitentiary for not less than 10 nor more than 20 years. TCA § 39–2408.

When the jury fixed an unauthorized sentence rendering the verdict void, it was altogether proper for the court to redirect the jury's attention to the punishment provided by law for second degree murder and to direct them to reconsider their verdict in Harvey E. Jenkins' case on that basis. Strunk v. State, 209 Tenn. 1, 348 S.W.2d 339. Indeed, failure to do so would have been a gross dereliction.

■ There is no merit in Harvey E. Jenkins' contention that the trial court's charge led the jury to believe this defendant should be found guilty of the same offense as Robert Lee Jenkins. That the jury was not confused or misled in that respect, either by the original charge with reference to aiding and abetting or in the supplemental instruction above quoted, is conclusively demonstrated by the fact that the jury initially found this defendant guilty of aiding and abetting in the commission of second degree murder and adhered to that verdict following the supplemental instruction.

■ We must also reject Harvey E. Jenkins' argument here that Presley v. State, supra, required the trial judge to give "a complete and full charge of the lesser included offenses."

In the first place, this defendant did not raise that complaint in his motion for a new trial, with the result that it cannot be considered here. Hughes v. State, 3 Tenn.Cr.App. 602, 465 S.W.2d 892; Nelson v. State, Tenn.Cr.App., 470 S.W.2d 32; Rules 14(4) and 14(5) of the Rules of the Supreme Court of Tennessee, adopted by this Court.

Additionally, Presley v. State, supra, bears no factual resemblance to the case before us. In *Presley,* both J. D. Presley and Herman Presley were jointly indicted, tried and convicted of assault with intent to commit murder in the first degree. J. D. Presley and his wife were separated and she had instituted a divorce action against him. After both men watched her leave her place of employment and followed her, J. D. Presley stabbed her several times when they came to where she was engaged in conversation with another man. During the assault, Herman Presley aided and abetted his brother by restraining the bystanders from interfering. The question propounded to the trial judge by the jury was "Whether or not we can find Herman Presley guilty of a different degree of crime than we might find J. D. Presley." The trial judge simply reminded the jurors that they were the sole judges of the guilt or innocence of the defendants and of the different degrees of crime "heretofore defined and explained to you." Upon consideration of those facts, the Court reversed Herman Presley's conviction and remanded his case for a new trial, holding that he was entitled to additional instructions differentiating his status from that of his brother so as to guide the jury in determining the degree of his guilt. The Court said:

"In so far as the guilt of Herman Presley of some degree of an unlawful assault is concerned, there can be no question upon the proof but that he was present aiding and abetting his brother by preventing the interference of bystanders in behalf of Mrs. Presley. The intervention and assistance of Herman Presley was rendered indisputably unlawful by the unlawfulness of the actions of J. D. Presley, in whose behalf the assistance was rendered. Johnson v. State, 125 Tenn., 420, 425, 434–435, 143 S.W. 1134, Ann.Cas.1913C, 261, and cases there cited.

"And if Herman Presley had knowledge of the fact that his brother had followed his wife with intent to assault her, or to do her violence, and came with his brother to assist him and did assist him, his guilt as an aider and abetter is in the same degree as that of his brother in whose unlawful purpose and design he shared. Moody v. State, 46 Tenn. (6 Cold.) 299; Reagan v. State, 155 Tenn. 397, 293 S.W. 755.

"In Riggs v. State, 43 Tenn. (3 Cold.) 85, 91 Am.Dec., this court noted the converse of the rule stated in Moody v. State, *supra*, thus: ' "Yet if many be together upon a lawful account, and one of the company kill another of an adverse party, without any particular abetment of the rest to this fact of homicide, they are not all guilty that are of the company, but only those that gave the stroke, or actually abetted them to do it." ' In such case, since the guilt of the abetter arises, not from his presence with the person who strikes the blow, but from the fact of his own participation, it would seem that the degree of his guilt is to be determined according to his own criminal intent and not according to the intent and degree of guilt of the principal offender.

\* \* \* \* \* \*

"So, applying this rule to the proof in the case at bar, we think the jury should have been instructed that, if Herman Presley came to the scene of the assault without knowledge of any purpose on the part of his brother to assault his wife, or to commit any other act of unlawful violence, so that they were not engaged in a common unlawful enterprise, and if the assistance given by Herman Presley was without deliberation and premeditation, then he would not be guilty of the same degree of felonious assault as his brother, but of an assault with intent to commit murder in the second degree or manslaughter, according to whether his participation was with malice or induced by sudden passion, upon adequate provocation."

In the case before us, the record admits of no doubt whatever that both brothers, both Robert Lee Jenkins and Harvey E. Jenkins, were engaged in an unlawful act. Unquestionably, both knew what they were doing and had a community of purpose, as demonstrated by the statement by one or the other, "Why don't we just kill that son of a bitch going there?" and by their appearance together on the porch where Harvey opened the assault by firing his shotgun into the side of Morelock's car as the latter walked toward it and as the deceased was either sitting in it or standing on the opposite side. Under these facts there was not and could not be any issue as to a lesser included offense as far as Harvey E. Jenkins was concerned. *Presley* does not hold that in all cases involving aiders and abettors the trial judge must charge they may be convicted of aiding and abetting in the commission of offenses lesser than the principal actor is found guilty of. Nor does *Presley* in any way conflict with the legal principle quoted above from Corpus Juris Secundum that an aider and abettor must share in the criminal intent of the principal actor and the same intent must exist in the minds of both.

The defendant Robert Lee Jenkins complains that the court erroneously overruled his objection when the District Attorney General argued to the jury that the defendants were guilty and this kind of killing had to be stopped and only the jury could do anything about stopping it, "because you write the community standards. You decide what kind of standards this community has . . ." In Wooten v. State, 203 Tenn. 473, 314 S.W.2d 1, the Court held that an argument urging conviction of the accused to prevent injustice and deter others was not improper when the opinion expressed is not based on something not appearing in the evidence.

In a speech before the United States Judicial Conference for the Sixth Circuit in Louisville, Kentucky on June 1, 1973, United States District Judge Frank W. Wilson said this:

" . . . So jury trial is more than an instrument of justice. It is the one sure symbol that freedom still lives.

"As Sir William Holdsworth in his classic History of English Law has stated:

'The jury system has for some hundreds of years been constantly bringing

the rules of the law to the touchstone of contemporary common sense.' "

In this case we find nothing in this record even to suggest, much less to show, that the District Attorney General's statement affected the verdict to the prejudice of the defendants. That is the general test applicable in such cases. Shadden v. State, 2 Tenn.Cr.App. 450, 455 S.W.2d 164; King v. State, 1 Tenn.Cr.App. 101, 430 S.W.2d 810.

 Finally, there is no merit in Robert Lee Jenkins' contention that the trial court erred in limiting him to eight peremptory challenges. This defendant insists that, being charged with a capital offense, he was entitled to 15 peremptory challenges as provided in TCA § 40–2510. This case was tried September 27, 1972. On June 29, 1972, the Supreme Court of the United States outlawed the death penalty under statutes leaving its imposition to the untrammeled discretion of the trial jury. Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346. Thus, *Furman* struck down capital punishment in Tennessee.

In Beeler v. State, 206 Tenn. 160, 332 S.W.2d 203, the Court, quoting Black's Law Dictionary, 3rd Edition, defined a capital case as "one in or for which the death penalty may, but need not necessarily be inflicted." So, at the time of this trial first degree murder was not a capital offense in this State. The trial judge correctly held, therefore, that this defendant charged with first degree murder was not on trial for a capital offense and was entitled only to the eight peremptory challenges allowed to defendants in felony trials generally. TCA § 40–2510.

Affirmed.

DWYER and RUSSELL, JJ., concur.