IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 2000 Session

## STATE OF TENNESSEE v. DANA LOUISE SOLOMON

**Appeal from the Criminal Court for Knox County**
**No. 62250-B    Mary Beth Leibowitz, Judge**

---

**No. E1999-01108-CCA-R3-CD**
**August 18, 2000**

---

The appellant, Dana Louise Solomon, was convicted by a jury in the Knox County Criminal Court of first degree murder and received a sentence of life imprisonment in the Tennessee Department of Correction. On appeal, she raises several issues for our review. However, because the appellant failed to timely file her motion for new trial, she has waived all issues with the exception of her challenge to the sufficiency of the evidence underlying her conviction. Moreover, the appellant failed to timely file her notice of appeal. Nevertheless, in the interest of justice, we address the sufficiency of the evidence. Upon a review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON AND JAMES CURWOOD WITT, JR., JJ., joined.

D'Artagnan H. (Chip) Perry, Knoxville, Tennessee, for the appellant, Dana Louise Solomon.

Paul G. Summers, Attorney General and Reporter, R. Stephen Jobe, Assistant Attorney General, Randall E. Nichols, District Attorney General, and Robert L. Jolley, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The appellant's conviction of premeditated, first degree murder arose from her criminal responsibility for the murder of her estranged husband, Clyde Milton Solomon, by her boyfriend, Thomas Chambers. For her offense, the appellant received a sentence of life imprisonment in the Tennessee Department of Correction. On appeal, the appellant presents the following issues for our review: (1) whether the evidence adduced at trial is sufficient to support the jury's verdict; (2) whether the trial court erred in sustaining the State's objection to the appellant's use of the term "interrogation" during the cross-examination of a witness; and (3) whether, following the initial recitation of jury instructions, the trial court erred in correcting the instructions pursuant

to the State's request.  Due to the appellant's failure to timely file her motion for new trial, she has waived the above issues with the exception of her challenge to the sufficiency of the evidence.  As to the sufficiency of the evidence, the appellant also failed to timely file a notice of appeal.  In any event, we conclude that the evidence of the appellant's guilt was overwhelming and affirm the judgment of the trial court.

**I.**

The trial court in this case entered the judgment of conviction on January 13, 1999, and the appellant filed her motion for new trial on February 22, 1999, more than thirty days thereafter.  Tenn. R. Crim. P. 33(b) provides that a motion for new trial must be made in writing or reduced to writing within thirty days of the "date the order of sentence is entered."  See also Tenn. R. Crim. P. 32(e)("[a] judgment of conviction shall set forth the plea, the verdict or findings, and the adjudication and sentence").  The time limitation set forth in Tenn. R. Crim. P. 33(b) is not only mandatory but also jurisdictional.  State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997); State v. Johnson, 980 S.W.2d 414, 418 (Tenn. Crim. App. 1998); State v. Bowling, No. 03C01-9805-CR-00167, 1999 WL 782470, at *4 (Tenn. Crim. App. at Knoxville, September 28, 1999).  In other words, the trial court in this case did not possess jurisdiction to hear the appellant's motion for new trial following the expiration of the time limitation, id., and this court does not have the authority to waive the requirement of a timely filed motion for new trial.  Johnson, 980 S.W.2d at 418.  Thus, the appellant has relinquished her right to argue in this appeal any issues that were or should have been presented in her motion for new trial, Martin, 940 S.W.2d at 569; Johnson, 980 S.W.2d at 418; Bowling, No. 03C01-9805-CR-00167, 1999 WL 782470, at *4; Tenn. R. App. P. 3(e), i.e., any issues that would not require the outright dismissal of the appellant's case, State v. Seaton, 914 S.W.2d 129, 131 (Tenn.Crim.App. 1995).

That having been said, this court may, in its discretion, take notice of an error which affects a substantial right of a defendant when necessary to achieve substantial justice.  State v. Smith, No. W1998-00156-SC-R11-CD, 2000 WL 872830, at *7 (Tenn. at Jackson, June 30, 2000); Tenn. R. Crim. P. 52(b).  After carefully reviewing the issues presented by the appellant and the record before this court, we decline to exercise our discretion.  Accordingly, the sole remaining issue is the appellant's challenge to the sufficiency of the evidence.

However, we are faced with yet another problem.  Under Tenn. R. App. P. 4(a), a defendant must file her notice of appeal within 30 days "after the date of entry of the judgment appealed from . . . ."  Again, the judgment in this case was entered on January 13, 1999.  The appellant filed her notice of appeal on April 13, 1999.  Of course, the timely filing of a motion for new trial tolls this time limitation until the entry of the order denying the motion.  Tenn. R. App. P. 4(c).  Yet, as we have already observed, the appellant in this case failed to file her motion for new trial in a timely fashion.  Moreover, we note that, even if the appellant had timely filed her motion for new trial, the order denying the appellant's motion was entered on March 8, 1999.  The appellant's notice of appeal was filed more than thirty days thereafter.

We acknowledge that, unlike the motion for new trial, the notice of appeal document is not jurisdictional, and this court may waive the timely filing of such document in the interest of justice. Tenn. R. App. P. 4(a). We will, therefore, address the appellant's challenge to the sufficiency of the evidence.

## II.

In Tennessee, appellate courts accord considerable weight to the verdict of a jury in a criminal trial. In essence, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that "no reasonable trier of fact" could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not this court. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

In this case, it was largely undisputed that the appellant's boyfriend, Mr. Thomas Chambers, killed her husband, Mr. Clyde Solomon. The principal issues at trial were whether the killing constituted first degree, premeditated murder and whether the appellant was criminally responsible for the killing. Thus, the State was first required to prove beyond a reasonable doubt that Mr. Chambers killed Mr. Solomon intentionally and with premeditation. Tenn. Code Ann. § 39-13-202(a)(1) (1997).

> A premeditated act is one done after the exercise of reflection and judgment. Premeditation requires that the prior intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d). "At the same time, if a defendant becomes impassioned later, but 'the intent to kill was formed as a result of premeditation . . . prior to the crime, it is immaterial that the act was carried out in a state of passion.'" State v. Sims, No. W1998-00634-CCA-R3-DD, 2000 WL 298901, at *7 (Tenn. Crim. App. at Jackson, March 14, 2000)(citations omitted).

The State may prove the necessary elements of first degree murder by direct evidence, circumstantial evidence, or a combination thereof. State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). Accordingly, the circumstances surrounding the killing may suffice to satisfy the State's burden of proving premeditation. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998), cert. denied, 526 U.S. 1147, 119 S.Ct. 2025 (1999); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); Brown,

836 S.W.2d at 539; State v. Burlison, 868 S.W.2d 713, 717 (Tenn. Crim. App. 1993). Specifically, the following factors will support a jury's inference of premeditation: (1) facts about the defendant's prior relationship to the victim from which motive may be inferred; (2) declarations by the defendant of an intent to kill; (3) planning activities by the defendant before the killing, including the procurement of a weapon or preparations for concealment of the crime; (4) the nature of the killing, including the defendant's use of a deadly weapon upon an unarmed victim, the killing of the victim while the victim is retreating or attempting to escape, or the particular cruelty of the killing; (5) the defendant's demeanor before and after the killing, including calmness immediately after the killing. Pike, 978 S.W.2d at 914-15; Bland, 958 S.W.2d at 660 (citing Brown, 836 S.W.2d at 541-42, and State v. West, 844 S.W.2d 144, 148 (Tenn. 1992)); State v. Gentry, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993); State v. Anderson, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). With respect to the nature of the killing, repeated shots or blows will not alone establish premeditation but may be considered along with other circumstances in assessing the existence of premeditation. Brown, 836 S.W.2d at 542.

The State was also required to prove beyond a reasonable doubt that the appellant was criminally responsible for the first degree, premeditated murder committed by Mr. Chambers. In other words, the State was required to prove that the appellant,

> [a]cting with intent to promote or assist the commission of . . . [the first degree, premeditated murder], or to benefit in the proceeds or the results of the offense, . . . solicit[ed], direct[ed], aid[ed], or attempt[ed] to aid . . . [Mr. Chambers] to commit the offense . . . .

Tenn. Code Ann. § 39-11-402 (2) (1997). This provision is derived from the common law and embraces the common law principles governing aiders and abettors and accessories before the fact. State v. Carson, 950 S.W.2d 951, 955 (Tenn. 1997); State v. Cowart, No. 03C01-9512-CR-00402, 1999 WL 5174, at *9 (Tenn. Crim. App. at Knoxville, January 8, 1999), perm. to appeal denied, (Tenn. 1999). According to these common law principles, "[t]o be criminally responsible for the acts of another, a defendant must 'associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree . . . .'" Id. (citing Jenkins v. State, 509 S.W.2d 240, 245 (Tenn. Crim. App. 1974)).

On appeal, the appellant does not dispute that Mr. Chambers committed the first degree, premeditated murder of her husband. Rather, she asserts that the State failed to establish that she was criminally responsible for the murder. We disagree. The evidence adduced at trial established that the appellant and the victim, Mr. Solomon, married on March 6, 1995, and had one infant son named Adrian. In October 1996, the appellant and Mr. Solomon separated, and the appellant and Adrian moved into a trailer with Mr. Chambers. The appellant was unable to afford a divorce from Mr. Solomon, and, as her relationship with Mr. Chambers progressed, the appellant began to express her wish that her husband would die. In this regard, the State introduced several letters or journal entries seized from the appellant's trailer following the murder. One undated letter appears to be addressed to Mr. Chambers. In the letter, the author professes her love for Mr. Chambers and repeatedly writes, "Clyde dies." A second letter is dated December 6, 1996, less than one month prior to the murder, and is similarly addressed to Mr. Chambers. The author states,

-4-

> Tomorrow is my birthday, and I hope you know what would be the best gift ever. Well, I guess I'll tell you. It's for someone to bring me proof that Clyde is dead. Truly . . . dead.
>
> I want him out of my life for good. I can't say that it won't hurt me for him to die, because I know it will, but at the same time I will be so f***ing happy . . . . I love you always, always will. Nothing in this world will change that.

The State established at trial that the appellant was born on December 7, 1975. Moreover, interspersed amongst the letters or journal entries are drawings of hearts containing the names of the appellant and Mr. Chambers.

The State further established that, in the early afternoon of December 26, 1996, Mr. Solomon arrived at the appellant's trailer and asked the appellant if he could visit his son. The appellant informed Mr. Solomon that Adrian was not at home at that time but assured Mr. Solomon that he would be able to see his son if he returned to the trailer later in the afternoon. Apparently, Adrian was then residing with Mr. Chambers' mother due to problems with the plumbing in the trailer. Notwithstanding her assurances to Mr. Solomon, the appellant never retrieved Adrian from Mr. Chambers' mother on the day in question.

In a confession to police, the appellant recounted that, instead, she and Mr. Chambers discussed the possibility of killing her husband upon his return to the trailer, and Mr. Chambers formulated a plan to shoot Mr. Solomon and claim self-defense. Specifically, Mr. Chambers "was going to cut his self . . . [a]nd say that Clyde cut him." Mr. Chambers assigned to the appellant the job of ensuring that her husband entered the trailer during his visit. Moreover, in anticipation of the arrival of police following the murder, Mr. Chambers instructed the appellant to remove drug paraphernalia from the trailer.

The appellant further confessed to police that she followed Mr. Chambers' instructions, albeit the appellant claimed that she did so only because Mr. Chambers threatened her life. Moreover, the evidence adduced at trial otherwise reflects the appellant's cooperation with Mr. Chambers' plan. Sean Collier, a friend and co-worker of Mr. Solomon, testified that he accompanied Mr. Solomon to visit Adrian on December 26, 1996. When Mr. Collier and Mr. Solomon arrived at the trailer in the late afternoon, the appellant informed Mr. Solomon that Adrian was being bathed by a neighbor in an adjacent trailer. She insisted that, in the meantime, Mr. Solomon come into her trailer and speak with Mr. Chambers. Indeed, she indicated that Mr. Solomon's visitation with his son was contingent upon his entry into her trailer. Mr. Solomon agreed and entered the appellant's trailer, whereupon the appellant carried a towel or blanket to the neighboring trailer in which Adrian was purportedly being bathed.

Mr. Collier waited outside while Mr. Solomon spoke with Mr. Chambers inside the appellant's trailer. As he waited, Mr. Collier overheard an argument between Mr. Solomon and Mr. Chambers. When Mr. Collier knocked on the trailer's front door, Mr. Solomon assured Mr. Collier

that he would be coming outside soon. At this point, the appellant reemerged from the neighboring trailer and informed Mr. Collier that Adrian was asleep and that she did not wish to awaken him. Mr. Collier, in turn, informed the appellant that he had overheard an argument between Mr. Chambers and Mr. Solomon, but the appellant did not appear to be concerned and continued a conversation with Mr. Collier. Mr. Collier then heard two gunshots from inside the appellant's trailer, and Mr. Solomon emerged from the front door of the trailer. Mr. Solomon appeared to be injured, and, as Mr. Collier watched, Mr. Chambers appeared at a nearby window of the trailer, pointed a shotgun out of the window, and fired the weapon in the direction of Mr. Solomon's head. Mr. Solomon collapsed onto the ground. Mr. Collier ran in search of a telephone.

The evidence at trial established that, inside the trailer, Mr. Chambers shot Mr. Solomon two times in the chest at close range with a twelve-gauge shotgun. As Mr. Solomon fled out the front door of the trailer, Mr. Solomon shot him one more time in the face. Mr. Solomon died as a result of the two shotgun wounds to the chest. Following the murder, Mr. Chambers did not attempt to flee. Rather, when the police arrived at the trailer, he was in the living room watching cartoons on television. The shotgun was lying on a couch in the same room.

Carol Lewis, the appellant's neighbor, testified that, on the day of the murder, the appellant arrived at her trailer carrying something wrapped in a baby's blanket. The appellant asked Ms. Lewis if she could leave an item in Ms. Lewis' trailer because the police would be arriving soon. Ms. Lewis refused to keep the item but allowed the appellant to briefly use her telephone. Finally, Ms. Lewis asked the appellant to leave. Soon thereafter, Ms. Lewis heard gunshots from the direction of the appellant's trailer. Upon looking out her window, Ms. Lewis observed Mr. Solomon lying on the ground in front of the appellant's trailer. Mr. Chambers was standing in the doorway of the trailer with a shotgun, watching the victim. When Mr. Solomon stopped breathing, Mr. Chambers returned inside. Ms. Lewis asserted at trial that at no time on the day of the murder was the appellant's baby inside her trailer. The police later discovered a container of drug paraphernalia wrapped in a baby's blanket inside one of the vehicles parked beside the appellant's trailer.

Finally, both Mr. Collier and Ms. Lewis testified that they could not recall seeing anything in Mr. Solomon's hands at the time of the murder. Nevertheless, the police discovered a "box cutter" lying close beside the victim's right hand. There were no fingerprints on the box cutter and the only blood on the instrument was on the one side touching the ground and a pool of blood that had formed beside the victim. Dr. John Carl Neff, an expert in the field of pathology, testified that Mr. Solomon would have been unable to carry anything in his right hand after receiving the two shotgun wounds to his chest.

In sum, the above evidence amply supports findings that the appellant was aware that Mr. Chambers was going to kill her husband on the afternoon of December 26, 1996, the appellant shared Mr. Chambers' intent to kill her husband and participated in the planning of the murder, and the appellant both solicited and aided Mr. Chambers' commission of the offense. This issue is without merit.

**III.**

For the foregoing reasons, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE