# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 5, 2011

## STATE OF TENNESSEE v. RANDY ANTONIO RICE

**Direct Appeal from the Circuit Court for Madison County**
**No. 08-178     Roger A. Page, Judge**

---

**No. W2010-00146-CCA-R3-CD  - Filed August 9, 2011**

---

The Defendant-Appellant, Randy Antonio Rice, was convicted by a Madison County jury of first degree felony murder and facilitation of especially aggravated robbery, a Class B felony. He was sentenced as a Range I offender to consecutive sentences of life imprisonment and twelve years at thirty percent, respectively. On appeal, the Defendant-Appellant argues: (1) the evidence was insufficient to support his convictions, and (2) the trial court erred in imposing consecutive sentencing. Upon review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and J. C. MCLIN, JJ., joined.

Clifford K. McGown, Jr. (on appeal), Waverly, Tennessee, and George Morton Googe, District Public Defender, and Paul E. Meyers, Assistant Public Defender (at trial and of counsel on appeal), Jackson, Tennessee, for the Defendant-Appellant, Randy Antonio Rice.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; James (Jerry) G. Woodall, District Attorney General; and James W. Thompson, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

**Facts.** On August 20, 2004, the dead body of David Martin, the victim, was found inside his residence. The victim suffered four gunshot wounds, with two fatal gunshot wounds to his left and right chest and two "grazing gunshot wounds" to his head and arm. The victim's cause of death was "multiple gunshot wounds" and his manner of death was "homicide." The victim also had small cuts on the left side of his face, ear, and neck, some of which contained fragments of glass. He also had scrapes on both of his arms and on the

left side of his abdomen. A .32 caliber bullet was removed from the victim's body and a spent .32 caliber bullet was found in the hallway of the residence, near the body. Ballistic testing revealed that both of the .32 caliber bullets had been fired from the same gun. Several items, including some broken glass material in the living room, were covered in blood and were collected from the victim's home. Two pistols, a .25 caliber Titan and a .32 caliber Boston Bulldog, were found in the victim's car. However, testing revealed that the .32 caliber Boston Bulldog pistol did not fire either of the two bullets found at the scene of the crime.

Following the victim's death, the victim's brother, Paul Martin, was unable to locate the victim's wallet. Paul Martin said that the victim often kept his winnings from Tunica on his person or in his house. In addition, the living room of the victim's home "was in disarray" and there were signs of a "struggle."

An envelope with blood on it was taken from the scene from which a partial DNA profile was recovered. The partial profile did not exclude the victim but did exclude the Defendant-Appellant and his childhood friend, Jessie Rodgers, as possible contributors of the blood. DNA testing of other items collected from the home showed that the blood matched that of the victim.

During the investigation into the victim's death, officers received information about the Defendant-Appellant's involvement in the offenses against the victim from Cory Bowers, an individual who was facing federal drug charges. Although Bowers was convicted of his federal charges prior to the Defendant-Appellant's trial, his cooperation in the instant case was communicated to the U.S. Attorney's office. Consequently, the Assistant U.S. Attorney who prosecuted his case promised Bowers a reduced sentence in exchange for his assistance in the prosecution of the Defendant-Appellant.

At trial, Cory Bowers testified that he was not coerced to present certain testimony. Bowers stated that he, the Defendant-Appellant, and Jessie Rodgers had been friends since they were children. Prior to the offenses in this case, Bowers said that he and the Defendant-Appellant had driven by the victim's house, and the Defendant-Appellant had told Bowers that he knew the victim had money inside the house. The Defendant-Appellant then asked Bowers if he would go into the house with him to take the money. Although Bowers declined, the Defendant-Appellant approached him approximately a week later and again asked him to help with the robbery of the victim. Bowers declined a second time. On the day the offenses were committed in this case, Bowers said the Defendant-Appellant was gone from the neighborhood for approximately two hours and returned "with scratches and stuff on him." When he returned, the Defendant-Appellant told Bowers that he had stolen the victim's money and had shot the victim. Bowers said he saw the Defendant-Appellant with

Rodgers after the offenses were committed. Rodgers was shaking and looked frightened. The Defendant-Appellant and Rodgers then told Bowers that the victim "got to tussling with them[,]" and the Defendant-Appellant had to shoot the victim because "he wouldn't be still."

On cross-examination, Bowers acknowledged that the Defendant-Appellant's brother, Robert Rice, was responsible for his arrest on the federal drug charges. Bowers also admitted that he did not know how much his sentence would be reduced because the federal judge had wanted to determine the effectiveness of his testimony in the instant case before reducing his sentence. Bowers also acknowledged that he could have just as easily blamed Rodgers as the Defendant-Appellant for these crimes. However, on re-direct examination, Bowers confirmed that he had not lied about the Defendant-Appellant's involvement in the crimes in order to get a reduced federal sentence. He also confirmed that the Defendant-Appellant admitted to shooting the victim in this case.

The Defendant-Appellant consistently denied that he was involved in the robbery and murder of the victim until November 13, 2007. On November 13, 2007, the Defendant-Appellant admitted that he was, in fact, involved in the offenses against the victim. The Defendant-Appellant then told officers that he, his brother Robert Rice, and Jessie Rodgers went to the victim's house intending to commit a robbery. Initially, Robert Rice drove by and identified the victim's house. Later, the Defendant-Appellant drove Rodgers to the victim's house, dropped him off a short distance from the house, and then circled back to the area as Rodgers went inside the house. The Defendant-Appellant was aware that Rodgers was going to "hit the house and rob the [victim]." When Rodgers did not exit the house within a short amount of time, the Defendant-Appellant parked his car in front of the victim's house and approached the slightly open door of the victim's residence. He "hollered" for Rodgers to come outside so they could leave. When Rodgers finally appeared, he was bleeding "real bad [sic]" and informed the Defendant-Appellant that he had been "hit." During the scuffle, the victim threw something and hit Rodgers in the eye. Rodgers told the Defendant-Appellant that he and the victim had wrestled over the gun and that he had shot the victim. The Defendant-Appellant drove Rodgers to his sister's home in Humboldt. When they got back to their neighborhood, Rodgers told everyone about the crime, and Robert Rice told him that he needed to go back to the victim's house and remove his fingerprints from everything he touched. Rodgers subsequently borrowed someone's car and went back to the victim's house. At nighttime, Rodgers returned with the victim's black wallet. Rodgers claimed that he only stole eighty dollars from the victim. Rodgers then gave the Defendant-Appellant and Robert Rice twenty dollars each. The Defendant-Appellant said that he never entered the victim's house the day of the offense. He also claimed that he did not tell anyone about the crime before giving the November 13, 2007 statement because he was frightened.

Robert Rice, the Defendant-Appellant's brother, denied any participation in the offenses against the victim and claimed that his brother's statement to police implicating him was not the truth. Robert Rice said that his brother regularly tells lies about him. On cross examination, he admitted that he had cooperated with the federal authorities to "set up" Bowers because he had a prior conviction for cocaine distribution.

Although the Defendant-Appellant was indicted for first degree premeditated murder, felony murder, and especially aggravated robbery, he was convicted of felony murder and facilitation of especially aggravated robbery. He received a life sentence and a consecutive twelve-year sentence, respectively. The Defendant-Appellant filed motions for new trial, which were denied. He subsequently filed a timely notice of appeal.

**Sentencing Hearing.** The State presented testimony from Dr. Christopher White, a psychiatrist with the Western Mental Health Institute. Dr. White testified that he evaluated the Defendant-Appellant personally and viewed the Defendant-Appellant's medical records, juvenile criminal records, and witness statements regarding the instant case. During his evaluation of the Defendant-Appellant, Dr. White also referred to the Diagnostic and Statistics Manual, Version IV, Text Revised, a manual for psychiatric disorders. He stated that the Defendant-Appellant spent twenty-three days at the institute, where he participated in interviews, group therapy, peer interaction, treatment teams, and two forensic conferences. After conducting a full evaluation, Dr. White concluded that the Defendant-Appellant was a dangerous mentally abnormal person pursuant to Tennessee Code Annotated section 40-35-115(b)(3). In reaching this conclusion, Dr. White focused on the Defendant-Appellant's numerous juvenile police reports evidencing his violent and sexually abusive behavior as well as his antisocial personality disorder diagnosis.

Dr. White acknowledged that he had been part of the team that had found the Defendant-Appellant competent to stand trial. However, he stated that conclusions as to competency and conclusions as to dangerous mentally abnormal persons were different issues which were determined by different factors. Because he observed the Defendant-Appellant malingering during his twenty-three days at the institute, Dr. White stated he disagreed with a previous doctor's diagnosis that the Defendant-Appellant suffered from paranoid schizophrenia. He explained that his disagreement with the doctor's diagnosis of paranoid schizophrenia did not mean that he and the previous doctor would necessarily disagree about whether the Defendant-Appellant met the legal definition of a dangerous mentally abnormal person.

**I. Sufficiency of the Evidence.** The Defendant-Appellant argues the evidence is insufficient to support his convictions. Specifically, he claims that there was no DNA evidence connecting him to the blood samples and physical evidence that was tested and that

Bowers' identification of him as one of the perpetrators was not credible since Bowers' sentence was reduced in exchange for his testimony. The State responds that because the Defendant-Appellant provided substantial assistance in the commission of the especially aggravated robbery of the victim, the evidence is sufficient to support his convictions for felony murder and facilitation of especially aggravated robbery. We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997) (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

First degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy[.]" T.C.A. § 39–13–202(a)(2) (2003). In order to sustain the conviction for felony murder, the State was required to prove that the Defendant-Appellant killed the victim in the perpetration of any robbery. Id. Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39–13–401(a) (2003). Especially aggravated robbery is robbery, as defined in section

39-13-401, which is accomplished with a deadly weapon and where the victim suffers serious bodily injury. Id. § 39-13-403(a) (2003).

"Although intent to kill is not required under the felony murder statute, the perpetrator must possess the requisite intent to commit the underlying felony for a felony murder conviction to be sustained." State v. John Dennis Rushing, No. 01 C01– 9501–CR–00020, 1996 WL 63920, at *6 (Tenn. Crim. App., at Nashville, Feb. 13, 1996), perm. to appeal denied (Tenn. July 22, 1996). "The killing may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action." State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999). Proof of the intention to commit the underlying felony, and at what point it existed, is a question of fact to be decided by the jury after consideration of all the facts and circumstances. Id. at 107.

An individual is criminally responsible for the conduct of another if:

(1) Acting with the culpability required for the offense, the person causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense;

(2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense; or

(3) Having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the person fails to make a reasonable effort to prevent commission of the offense.

T.C.A. § 39-11-402 (2003).

Criminal responsibility is not a distinct crime but "a theory by which the state may prove the defendant's guilt based on another person's conduct." State v. Osborne, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (citing State v. Mickens, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)). In order to be held criminally responsible for the acts of another, the defendant must "'in some way associate himself with the venture, act with the knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976) (quoting Jenkins v. State, 509 S.W.2d 240, 244-45 (Tenn. Crim. App. 1974)). Additionally, there is no requirement that the State "elect between prosecution as a principal actor and prosecution for

criminal responsibility." State v. Hodges, 7 S.W.3d 609, 625 (Tenn. Crim. App. 1998) (citing State v. Williams, 920 S.W.2d 247, 257-58 (Tenn. Crim. App. 1995)).

The Defendant-Appellant was also found guilty of facilitation of especially aggravated robbery. A person is guilty of the facilitation of a felony "if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." T.C.A. § 39-11-403(a) (2003).

Here, the evidence, viewed in the light most favorable to the State, shows that the Defendant-Appellant was guilty of first degree felony murder under a theory of criminal responsibility. According to the Defendant-Appellant's version of events, he drove Rodgers to the victim's house for the purpose of robbing the victim. He let Rodgers out near the victim's residence, and circled around to pick him up. When Rodgers failed to exit the victim's house after a reasonable period of time, the Defendant-Appellant approached the victim's door and yelled for him. Rodgers finally appeared, covered in blood, and informed the Defendant-Appellant that he had fought with the victim and had shot him. The Defendant-Appellant and Rodgers returned to their neighborhood, where Robert Rice convinced Rodgers to return to the victim's house to remove his fingerprints. Rodgers left in another person's vehicle, and when he returned from the victim's house, he had a black wallet. Rodgers told everyone that he recovered only eighty dollars from the victim and then gave the Defendant-Appellant and Robert Rice twenty dollars each. Based on this evidence, a jury could have determined, based on a theory of criminal responsibility, that the Defendant-Appellant "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense" aided or attempted to aid Rodgers in killing the victim during the robbery. In addition, the jury could have also determined that the Defendant-Appellant was guilty of facilitation of especially aggravated robbery because he furnished substantial assistance to Rodgers, knowing that Rodgers intended to rob the victim. See State v. Quartes Williams, No. W2008-01946-CCA-R3-CD, 2009 WL 2971046, at *11 (Tenn. Crim. App., at Jackson, Sept. 14, 2009), perm. to appeal denied (Tenn. Feb. 22, 2010) (concluding that a rational jury could have found the defendant guilty of both first degree felony murder under a theory of criminal responsibility and facilitation of especially aggravated robbery since the defendant furnished substantial assistance to an accomplice, knowing that the accomplice intended to rob the victim).

Moreover, the jury could have also found the Defendant-Appellant guilty of both crimes under a theory of direct responsibility with the defendant as the principal actor. See id. at *12 (further concluding that the jury could have found the defendant guilty under a theory of direct responsibility in light of the testimony from the medical examiner and of the statement arguably signed by the defendant). Bowers testified that although Rodgers was

involved in the offenses, the Defendant-Appellant admitted to robbing and shooting the victim. The evidence presented at trial is sufficient to support the Defendant-Appellant's conviction for first degree felony murder and facilitation of especially aggravated robbery. Accordingly, the Defendant-Appellant is not entitled to relief on this issue.

**II. Sentencing.** The Defendant-Appellant next argues that the trial court abused its discretion in ordering that his twelve-year sentence be served consecutively rather than concurrently to his sentence of life imprisonment. He suggests that his effective sentence of sixty-three years is not reasonably related to the seriousness of his offenses. The State responds that the trial court properly imposed consecutive sentencing pursuant to Tennessee Code Annotated section 40-35-115(b)(3) (2003) and that the record supports the Defendant-Appellant's sentence. We agree with the State.

On appeal, we must review issues regarding the length and manner of service of a sentence de novo with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d) (2003). Nevertheless, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The defendant has the burden of showing the impropriety of the sentence. T.C.A. § 40-35-401(d) (2003), Sentencing Comm'n Comments. This means that if the trial court followed the statutory sentencing procedure, made adequate findings of fact that are supported by the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, this court "may not disturb the sentence even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). Because the trial court properly considered the sentencing principles and all relevant facts and circumstances in this case, our review will be de novo with a presumption of correctness.

A trial court, when sentencing a defendant, must consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the enhancement and mitigating factors in §§ 40-35-113 and 40-35-114; and

(6) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b) (2003).

Where a defendant is convicted of one or more offenses, the trial court has discretion to decide whether the sentences shall be served concurrently or consecutively. Id. § 40-35-115(a) (2003). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the seven categories in section 40-35-115(b) (2003). An order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense." Id. § 40-35-102(1) (2003). In addition, the length of a consecutive sentence must be "no greater than that deserved for the offense committed." Id. § 40-35-103(2) (2003).

Although the Defendant-Appellant argues that the trial court improperly applied the dangerous offender criteria as stated in section 40-35-115(b)(4), the record is clear that the trial court imposed consecutive sentencing based solely on its finding that the Defendant-Appellant was a dangerous mentally abnormal person as stated in section 40-35-115(b)(3). Pursuant to this particular subsection, a trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that "[t]he defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences[.]" Id. § 40-35-115(b)(3) (2003).

Upon review, we conclude that the trial court did not abuse its discretion in ordering the Defendant-Appellant to serve his sentences consecutively. A finding of any one of the factors in section 40-35-115(b) can justify a trial court's imposition of consecutive sentencing. The record shows that the trial court determined that Dr. White was a competent psychiatrist who concluded that the Defendant-Appellant was a dangerous mentally abnormal person whose criminal conduct had been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences. See id. Although the court noted that it was unnecessary to consider the factors for a dangerous offender as stated in State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995), it noted that consecutive sentencing was appropriate in this case because it "protect[ed] the public against further criminal conduct" by the Defendant-Appellant and because it "reasonably relate[d] to the severity of the offenses." We conclude that the trial court properly found by a preponderance of the evidence that the Defendant-Appellant was a dangerous mentally abnormal person. See T.C.A. § 40-35-115(b)(3) (2003). Accordingly, the trial court's judgments are affirmed.

## CONCLUSION

Upon review, the judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE