# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
September 11, 2001 Session

## STATE OF TENNESSEE v. WALDO WIGGINS, JR.

**Direct Appeal from the Circuit Court for Tipton County**
**No. 3945     Joseph H. Walker, Judge**

---

### No. W2000-02766-CCA-R3-CD - Filed December 14, 2001

---

Following transfer to circuit court for trial as an adult, the juvenile defendant, Waldo Wiggins, Jr., was convicted of first degree murder. On appeal, Defendant challenges (1) whether the denial of bail by the juvenile court and subsequent bond of $ 250,000 set by the circuit court violated his right to due process of law, and (2) whether the evidence was sufficient to support his conviction. After a review of the record, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed.**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, and ROBERT W. WEDEMEYER, JJ., joined.

C. Michael Robbins, Memphis, Tennessee (on appeal) and Gary F. Antrican, District Public Defender; and David S. Stockton, Assistant Public Defender, (at trial) for the appellant, Waldo Wiggins, Jr.

Paul G. Summers, Attorney General and Reporter; Kim R. Helper, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; Walt Freeland, Assistant District Attorney General; and Kim Linville, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### PROCEDURAL BACKGROUND

On April 14, 1999, the body of seventeen-year-old Tatrina Terry, the victim in this case, was discovered lying in a field beside her car. Terry had been strangled and shot three times in the head. She was twenty weeks pregnant when she died. Approximately six months later, on October 28, 1999, the Tipton County Sheriff's Office filed a petition in juvenile court which alleged that Defendant committed the killing. He was then arrested and detained in the Shelby County Detention Center, pending a detention hearing in juvenile court on November 2, 1999. As a result of the detention hearing, Defendant was further detained pending a transfer hearing on November 17, 1999,

after which Defendant was placed into the custody of the Sheriff of Tipton County to be dealt with as an adult in the Circuit Court of that county. No bond was set.

On March 6, 2000, the Tipton County Grand Jury indicted Defendant on one count of intentional and premeditated first degree murder, Tenn. Code Ann. § 39-13-202. Thereafter, counsel was appointed and filed a motion to set bond. Following a hearing on March 23, bond was set at $250,000. Defendant remained in custody until his jury trial commenced on August 23, 2000, after which he was convicted of the intentional and premeditated killing of Tatrina Terry and sentenced to life imprisonment in the Tennessee Department of Correction.

On appeal, Defendant raises the following issues: (1) whether he was denied due process of law when he was detained without bail from October 1999 until March 2000 and, again, when bail was subsequently set at an excessive and punitive amount; and (2) whether the evidence was sufficient to support a conviction for any level of criminal homicide. After a thorough review of the record, we find no error and affirm the judgment of the trial court.

## FACTUAL BACKGROUND

On April 13, 1999, the victim, Tatrina Terry, came home from work at 9:55 p.m. and told her mother, Wylene, that she was leaving again. She did not indicate where she was going. Before retiring for the evening at 11:00 p.m., Wylene noticed Tatrina's pajamas lying on top of her bed. When Wylene woke up at approximately 6:00 a.m. the next morning, Tatrina was not at home and the pajamas were gone. Worried, Wylene dialed "*69" and discovered that the last person to call the Terry family's home used the telephone at Defendant's residence.

Although Tatrina's departure on April 13 was unobserved, a neighbor testified at trial that he heard Tatrina's car start up between 11:15 and 11:30 p.m. Another witness, Rodriquez Dean, testified that during a telephone conversation with Tatrina between 10:30 and 12:00 p.m. on April 13, she claimed that she was going out "to meet the dude" that night. Curious, Dean asked who she was referring to, and Tatrina replied, "the baby's father."

At approximately 6:30 a.m. on the morning of April 14, 1999, John David Martin and his uncle noticed a vehicle in the field next to Gainesville Road as they drove to work. The vehicle was blue and something white was lying beside it. Martin thought the car was in the process of being stripped and that the white object was the back seat. As the two men traveled home from work at approximately 12:00 noon, they saw that the car was still in the field and stopped. Upon closer inspection, the men discovered that the white object was a body and notified the police.

Ronnie Coleman, an investigator with the Tipton County Sheriff's Office, arrived at the scene approximately fifteen minutes after Martin and his uncle telephoned. The body of the victim, Tatrina, was on the ground beside her car, which was located approximately 200 yards from Gainesville Road in the middle of a field. Tatrina's body was dressed in pajamas and sandals, and Coleman observed no signs of a struggle. No tire tracks were apparent except for those belonging to Tatrina's car and the police car. Her personal property appeared to be untouched (a cell phone

and CD player were present), and the car keys were still in the ignition. Tatrina's head revealed multiple gunshot wounds, which were later determined to be the cause of death, and the presence of soot revealed that the weapon was in contact with the skin when fired. The autopsy report indicated Tatrina had also been smothered; the presence of small hemorrhages on the eyes and lungs, along with bruising on the mouth, were consistent with a hand placed forcefully over the mouth and nostrils. Although vaginal abrasions further indicated nonconsensual or "dry sex," probably within hours of death, no bruising or defensive wounds were present on the body.

Coleman testified at trial that Defendant became a suspect when the police learned from the victim's parents that Tatrina was planning to see him on the night she was killed. Moreover, at the time of Tatrina's death, Defendant believed he was the father of the baby she was carrying and lived approximately one-half mile from where Tatrina's body was discovered, if measured in a straight line, or "as the crow flies," over the cotton fields and a fence or two. Consequently, Coleman questioned Defendant shortly after Tatrina's body was discovered. During his conversations with the police, Defendant admitted that he and Tatrina had discussed abortion but also that they had abandoned the idea. He did not appear opposed to the idea of fatherhood and claimed to have no knowledge whether Tatrina had boyfriends other than himself. (Post mortem DNA testing by the TBI crime lab revealed that Defendant was not the father of Tatrina's baby.) Defendant lived at home and was seventeen years old when Coleman questioned him. Both of his parents were present.

Defendant informed Coleman that he spoke with Tatrina one time on the evening of April 13, 1999. She wanted to come over and see him. He said, "Yeah, come on," but he claimed that she never showed up. After Defendant told him this, Coleman received this information from the BellSouth telephone company indicating that the victim called Defendant six times between 11:41 p.m. and 12:03 a.m. on the evening prior to her death. When confronted with information, Defendant initially denied speaking with the victim that many times. Later, he recanted, claiming to be uncertain regarding the number of times they talked. Coleman testified at trial that Defendant was calm and cooperative during the investigation until they confronted him with the telephone company's records, at which point he appeared "down and out" and became "evasive." During cross-examination, Coleman conceded that the telephone records indicated only that six telephone calls to Defendant were attempted by the victim, not that they were completed. In fact, only one record entry showed a completed call between the victim's cell phone and the telephone at the Defendant's residence, which occurred at 12:02 a.m. in the morning of April 14, 1999 and lasted between one and two minutes.

Defendant informed Coleman that he was at home with his parents on the evening of April 13, 1999. Defendant's parents confirmed this statement, but Defendant's father, Waldo Wiggins, Sr., admitted that he and Defendant slept in rooms located at opposite ends of the house, and, thus, it was possible that once Waldo Sr. went to bed, he would not know what was going on at the other end of the house. Waldo Sr. also testified that persons other than his wife and Defendant may have stayed overnight at their home on April 13, 1999, but he could not be sure. Waldo Sr. was retired at that time, and it was not uncommon for him to start drinking alcohol at 8:00 a.m. In addition, the Wiggins' home was unlocked virtually twenty-four hours a day, seven days a week, and

approximately twelve to fifteen persons, not including friends and acquaintances, entered and left at will.

When Waldo Sr. was initially questioned as to whether the family kept guns at their residence, he was untruthful according to the testimony of Jerry Dyson, an investigator with the Sheriff's Office. In fact, the entire Wiggins family was familiar with guns, and a variety of weapons--handguns, shotguns, and rifles--were kept at the house. Waldo Sr. subsequently admitted this, but stated that he did not know exactly where they were stored because his wife, Mrs. Wiggins, occasionally moved them. Thereafter, it was discovered that on April 13, 1999, the handguns owned by the Wiggins' family were stored in a bag-type purse in the bedroom closet. Although, technically, access to the closet was not restricted by locks anywhere in the home, only Defendant, his parents, and his sister knew the general whereabouts of the weapons, and visitors were not allowed into the closets and purses.

On April 15, 1999, Waldo Sr. consented to a search of the Wiggins' home for weapons and Mrs. Wiggins led the officers to the purse which contained the handguns. As a result of the search, the police removed a number of weapons from the residence for further examination, including two .22 caliber rifles, a .32 caliber derringer, and a .22 caliber target pistol. Subsequent testing by the Tennessee Bureau of Investigation crime lab revealed small amounts of the victim's blood on the yoke and cylinder of the .22 caliber target pistol seized from the Wiggins' home, and bullet fragments removed from the victim's brain were determined to have come from the same weapon. Captain John Fletcher, also involved with the investigation, testified that the guns all appeared "oily," indicating they had probably been cleaned recently. Fletcher noted that the .22 caliber target pistol was unique in that it also smelled vaguely of burnt powder. Investigator Jerry Dyson, with the Tipton County Sheriff's Office, testified that the investigating officers showed Defendant four of the various guns seized from his home during one of their interviews with him. When Defendant saw the .22, he "stood up in his seat and backed up approximately two feet from the table, as if he was in shock." Defendant also admitted to Captain John Fletcher, also with the Tipton County Sheriff's Office, that he, his uncle, and his father were the only persons who usually fire the .22 target pistol.

Mrs. Wiggins had heard that Tatrina was expecting her son's baby. Defendant told her, "Mama, I have a baby on the way" and appeared excited, but she thought her son was joking. According to Defendant, Tatrina would often come over at night and tap on his window, wanting to come inside. He would let her into the house while everyone else was asleep and they would have sex. Mrs. Wiggins testified that on the evening of April 13, 1999, Tatrina was expected at their house. Defendant received calls from many girls, and Mrs. Wiggins preferred that the girls come to the house rather "than for him to go out in the street." When she informed Defendant of Tatrina's death the next day, April 14th, as he returned home from school, he responded, "They found her? Where she was?" Thereafter, Mrs. Wiggins accompanied Defendant to see Tatrina's family at the hospital. Defendant was quite upset, and he cried when he spoke with Tatrina's brother.

Defendant was preparing for the Mid-South Golden Gloves boxing tournament during the week Tatrina was killed. At that time, Defendant was in "excellent physical shape," according to

Jimmy Humphrey, his boxing coach. On April 14, 1999, Humphreys stayed the night at Defendant's home, along with two other boxers, and the next day, April 15, the team left for Little Rock, Arkansas, where Defendant performed well and competed in the finals. Humphreys reported that Defendant did not seem worried. Instead, he appeared "focused" during the entire competition.

During the trial, Special Agent Roger Turner with the Tennessee Bureau of Investigation testified that his first interview of Defendant left him with the impression that Defendant was "deceptive," because Defendant was untruthful regarding how many times he spoke with the victim the night before her death. Turner conceded that he did not interview any suspects other than Defendant and that the TBI did not check the victim's clothing because they did not receive this evidence. Investigator Coleman testified that the police officers did not confiscate Defendant's clothing for testing or submit the residue test which was performed on Defendant's hand. Coleman explained that results from a residue test are not conclusive. Coleman also conceded that the investigators discovered nothing at the crime scene which linked Defendant to the killing, and no evidence that the victim ever reached Defendant's home in the late evening of April 13th. Coleman also testified that when the police discovered that Defendant was not the father of the victim's baby, they did not attempt to discover the true father's identity.

Defendant did not testify during his trial.

## I.  DUE PROCESS

Defendant contends that he was denied due process of law (1) when he was detained without bail from the time of his arrest on October 28, 1999, until March 23, 2000, and (2) when bail was set at $250,000 at his bond hearing, which he now argues is excessive and punitive in nature.

### A.  Denial of Bond

To briefly review, Defendant was taken into custody on October 28, 1999. After a detention hearing in juvenile court on November 2, 1999, Defendant was ordered detained pending a transfer hearing. At the transfer hearing on November 17, 1999, bond was denied and Defendant was transferred to circuit court for prosecution as an adult. Following a bond hearing on March 23, 2000, bond was set at $250,000. Defendant remained in custody until his trial commenced on August 23, 2000.

Defendant first argues that his detention without bail constitutes a denial of due process because the juvenile court (1) failed to issue a written order specifying the basis for his detention, thereby violating Tennessee Code Annotated section 37-1-114(c)(3), and (2) failed to consider whether a "less restrictive alternative" would reduce the risk of flight or serious physical harm to others, as required by section 37-1-114(c)(7). See Tenn. Code Ann. § 37-1-114(c)(3), (7) (1997). We disagree.

Defendant's detention was clearly authorized by statute. Tennessee Code Annotated section 37-1-114(c)(1)(A) provides that

(c) A child shall not be detained in any secure facility or secure portion of any facility *unless*:
(1) There is probable cause to believe the child has committed a delinquent offense constituting:
(A) *a crime against a person resulting in the serious injury or death of the victim* or involving the likelihood of serious injury or death to such victim; or
(B) The unlawful possession of a handgun or carrying of a weapon, as prohibited by title 39, chapter 17, part 13. . . .

(Emphasis added.) The statute cited by Defendant as requiring a written order, Tennessee Code Annotated section 37-1-114(c)(3), applies in circumstances where the child is alleged to have committed only a "delinquent offense" and where "special circumstances" indicate the child should be detained. See Tenn. Code Ann. § 37-1-114(c)(3) (1997). Since section 37-1-114(c)(1)(A), quoted supra, is clearly applicable under the circumstances in this case and does not require a written order, we find that the juvenile court did not err in ordering detention or by declining to specify the basis for the detention in writing.

Regarding the juvenile court's alleged failure to consider "less restrictive alternatives" to detention as required under section 37-1-114(c)(7), we note that the record does not contain a transcript of either the detention hearing or the transfer hearing at which bond was denied. The record does include an audio tape dated "11/2/99" (the date of the detention hearing), but the quality of the recording is poor and, consequently, what occurred during the proceeding is difficult to understand. Moreover, the tape is incomplete, lasting only three minutes and forty seconds. As a result, the record is insufficient to review Defendant's allegation that the trial court failed to consider less restrictive alternatives. This issue is waived. See Tenn. R. App. P. 27(g); Tenn. Crim. App. R. 10.

Defendant also contends that the juvenile court erred when it denied bond at the conclusion of the transfer hearing. He relies upon Rule 24(b)(7) of Tennessee's Rules of Juvenile Procedure, which states that "[a]ny order of transfer shall specify the grounds for transfer and set bond if the offense is bailable pursuant to state law." Defendant's argument is correct.

Tennessee Code Annotated section 40-11-102 provides that "[b]efore trial, all defendants shall be bailable by sufficient sureties, except for capital offenses where the proof is evident or the presumption great." Similar language is contained in Article I, Section 15 of the Tennessee Constitution. A capital crime is defined as "one in or for which the death penalty may, but need not necessarily, be imposed." Black's Law Dictionary 209 (6th ed. 1990); see Jenkins v. State, 509 S.W.2d 240, 250 (Tenn. Crim. App. 1974). Since Defendant was a juvenile at the time he committed the crime, the death penalty was not an option. See Tenn. Code Ann. § 37-1-134(a)(1) (1997). Thus, the offense in issue was "bailable," and the juvenile court's summary denial of bail at the transfer hearing was inappropriate. Defendant has waived this issue, however.

According to the record, the juvenile court followed the proper procedure for transferring Defendant's case, under Tennessee Code Annotated sections 37-1-134(a) and (b), until Defendant

raised the issue of bond. Specifically, the audio tape of the juvenile proceeding indicates that the judge found that this matter was not within the court's jurisdiction. The judge informed Defendant that his transfer to circuit court terminated the juvenile court's jurisdiction, quoting Tennessee Code Annotated section 37-1-134 which states that a "transfer pursuant to subsection (a) terminates jurisdiction of the juvenile court with respect to any and all delinquent acts with which the child may then or thereafter be charged . . . ." The court's interpretation of this statute as it relates to setting bond was incorrect. According to the plain language of Rule 24(b)(7) of Tennessee's Rules of Juvenile Procedure, "[a]ny order of transfer shall specify the grounds for transfer and set bond if the offense is bailable pursuant to state law." See also Tenn. Code Ann. § 40-11-105. Thus, the juvenile court was required to set bond in this case, and the proper time for doing so was at the time Defendant's transfer was ordered.

This issue is nevertheless waived because the proper recourse subsequent to denial of bond in juvenile court was for Defendant to seek relief in circuit court. See Tenn. Code Ann. § 40-11-144(b) (1997). He did not. In fact, he delayed his objection to the juvenile court's decision to deny bail until he filed his motion for new trial. It is well-settled that a defendant should take whatever action is reasonably available to prevent or nullify the harmful effect of a court's error as soon as possible after it occurs. See Tenn. R. App. P. 36(a). Even if the juvenile court's decision in this case was erroneous, a failure to grant bond does not necessarily give rise to dismissal of an indictment. State v. Johnson, 980 S.W.2d 414, 421 (Tenn. Crim. App. 1998) (failure by General Sessions Court to set bond did not give rise to dismissal of the indictment). Defendant is not entitled to relief on this issue.

## B. Excessive and Punitive Bail

Defendant also contends that the bond amount of $250,000 constituted "excessive bail" in violation of Article I, Section 16 of the Tennessee Constitution. Defendant argues that because the bond amount was purposefully set at a level which he would be unable to meet, the measure was punitive, rather than remedial, and dismissal of the indictment is the only appropriate remedy.

After the Tipton County Grand Jury indicted Defendant on one count of first degree murder on March 6, 2000, his counsel filed a motion to set bond. During the bond hearing on March 23, 2000, Defendant requested that the bond not exceed $50,000. At the conclusion of the hearing, the trial court made the following statement:

> I've reviewed the file including the criminal record out of Juvenile Court of [Defendant] which is in the file. The Court has considered *the factors set out in T.C.A. 40-11-115*, including his age, ties to the community, his prior criminal record, which, in addition to the ones as having been mentioned [sic], indicates there are other problems that he's had, including being found at four o'clock in the morning while an officer was responding to a call about a prowler and so forth. The Court believes *the seriousness of the charge in this matter*, that a reasonable bond in the matter is $250,000, and sets bond at $250,000.

(Emphasis added.)

As a preliminary matter, we note that the factors in Tennessee Code Annotated section 40-11-115, the statute cited by the judge in his conclusion, are appropriate only when the defendant is considered for release on recognizance or unsecured bond. Thus, they were not applicable in Defendant's case. The applicable statute is Tennessee Code Annotated section 40-11-118. While the factors in the two sections are similar in many respects, the court's reliance on section 40-11-115 was erroneous. We further observe that the court's consideration of the "seriousness" of the offense was incorrect. Granted, according to subsection 40-11-118(6), the court may properly consider "[t]he nature of the offense and the apparent probability of conviction and the likely sentence." However, this factor requires more than a court's conclusion that the offense charged is "serious." The nature of the offense must be regarded in conjunction with the likelihood of conviction and the sentence that might be imposed. The record does not reflect that the court considered the nature of the offense in the specific light required by statute. Thus, setting of bond based on "the seriousness of the charge in this matter" was error.

Again, we observe that Defendant failed to seek relief at the appropriate time for raising his issue. See Tenn. Code Ann. § 40-11-144(b) (1997); Tenn. R. App. P. 8 and 36(a); State v. Melson, 638 S.W.2d 342, 358 (Tenn. 1982) (defendant's only effective remedy for setting of bail at $200,000 was to follow Tenn. R. App. P. 8 *promptly* after bail was set--not to wait until after conviction when appeal was of no practical effect or benefit). Thus, this issue is waived.

Even if the issue was not waived, Defendant would not be entitled to relief. In his brief, he contends that his bond was intentionally set at an excessive amount and that this constitutes a punitive action. He cites State v. Pennington, 952 S.W.2d 420 (Tenn. 1997) for the proposition that punitive action, unlike remedial action, constitutes a denial of due process of law when directed at an accused without an adjudication of guilt. Specifically, our supreme court in Pennington stated that "pre-trial detention that is remedial as distinguished from punitive is permissible provided that the individual is afforded sufficient procedural due process." Id. at 423 (citations omitted). Clearly, punishment prior to an adjudication of guilt is improper. However, we do not agree with Defendant's analysis of the circumstances in his case.

Defendant's conclusion that the bond amount of $250,000 was "punitive" relies upon two factors: (1) a comment by the prosecutor during the bond hearing, and (2) the fact that he was unable to make the bond. As to the former, the record reveals that the prosecutor made the following statement during the bond hearing:

We would ask the court to, if the court sets a bond at all, to set this bond extremely high and *to hold him until we can have a trial*. I think its' scheduled in July. We've had testimony from the school that he cannot reenter. *There would be nothing for him to be doing this summer*.

(Emphasis added.) Granted, some of the reasons, as stated by the prosecutor as grounds for setting a high bond, were not appropriate factors for determining the bail amount. However, there is nothing

in the record to indicate that the trial court set the amount of bond based upon any inappropriate reasons submitted by the prosecutor. The fact that the amount set was more than the Wiggins family was in fact able to raise does not render the amount "punitive."

In his brief, Defendant also cites State v. Johnson, 980 S.W.2d 414 (Tenn. Crim. App. 1998) and State v. Kenneth A. Adams, No. W1998-00531-CCA-R3-CD, Tipton County, (Tenn. Crim. App., Jackson, December 21, 1999), but fails to indicate how this Court's decisions in these matters support Defendant's position.

In sum, we disagree that the bond amount was excessive or punitive. Because Defendant was granted a bond hearing, we also find that he was afforded sufficient procedural due process so that pre-trial detention was permissible, especially in light of his failure to raise any objection to the court's ruling until after his trial and conviction. Defendant is not entitled to relief on this issue.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant contends that the evidence was insufficient to support a conviction for intentional and premeditated first degree murder or any other crime of homicide. Defendant claims that rational interpretation and/or logical and reasonable inferences from the evidence presented at trial simply cannot identify him as the perpetrator of this crime or sustain a finding of premeditation or guilt for any degree of criminal agency respecting the killing of the victim in this case. We disagree.

The proper inquiry for an appellate court determining the sufficiency of evidence to support a conviction, is whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court does not reweigh or reevaluate the evidence. Id.

The standard for appellate review is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Vann, 976 S.W.2d 93, 111 (Tenn. 1998). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993) (quoting State v. Duncan, 698 S.W.2d 63, 67 (Tenn.1985)). Since a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury. Id.; see also State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The identification of a defendant as the person who committed the offense for which he is on trial is a question of fact for the determination of the jury upon consideration of all relevant proof. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1995). Identity of the accused is only one element necessary to be proved, and it may be accomplished, as in this case, by circumstantial evidence. State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975). Where a conviction is based upon entirely circumstantial evidence, the jury must find that the proof is not only consistent with the guilt of the accused, but inconsistent with his innocence. Vann, 976 S.W.2d at 112. In other words, there must be an evidentiary basis upon which the jury can exclude every other reasonable theory or hypotheses except that of guilt. See id. The proper weight to be given circumstantial evidence is a question for the jury to determine. Pruitt v. State, 460 S.W.2d 385, 391 (Tenn. Crim. App. 1970).

Here, when considering the evidence in a light most favorable to the prosecution, as we must, we find the circumstantial proof to be sufficient so that any rational trier of fact could have found that Defendant committed the crime beyond a reasonable doubt. First, Defendant was intimately involved with the victim, who was on her way to see him in the hours prior to her death. Second, the weapon used to kill the victim was discovered in Defendant's home less than twenty-four hours after the body was found and Defendant knew how to use it. Third, Defendant behaved suspiciously when discussing the killing with the police. He reacted strangely when confronted with the murder weapon, and he was untruthful regarding his phone calls with the victim on the evening of the crime. Finally, Defendant's response upon being told of the victim's death by his mother was indicative of his guilt. Defendant's mother testified that upon learning of the victim's death, Defendant's first remark was "They found her? Where she was?" From this statement, a jury could reasonably infer that Defendant already knew about the homicide because he committed it.

Since Defendant was convicted of first degree murder, which in this case is defined as "[a] premeditated and intentional killing of another," the jury was also required to determine that Defendant acted intentionally and with premeditation. Tenn. Code Ann. § 39-13-202(a)(1) (1997). "Premeditation" is "an act done after the exercise of reflection and judgment," and "the intent to kill must have been formed prior to the act itself." Id. at § 39-13-202(d). It is not necessary that the intent to kill pre-exist in the mind of the defendant for any specific length of time, but "the mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." Id.

Because premeditation entails proof of a state of mind about which there may be no direct evidence, "cases have long recognized that the necessary elements of first degree murder may be shown by circumstantial evidence." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). Premeditation is a question of fact to be determined by the jury. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). And, the jury may infer premeditation from the manner and circumstances of the killing. See State v. Pike, 978 S.W.2d 904, 915 (Tenn. 1998); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Our supreme court has enumerated several factors that may support the existence of premeditation and deliberation, including: (1) declarations by the defendant of an intent to kill, (2) evidence of procurement of a

weapon, (3) the use of a deadly weapon upon an unarmed victim, (4) the particular cruelty of the killing, (4) infliction of multiple wounds, (5) preparation before the killing for concealment of the crime, (6) destruction or secretion of evidence of the murder, and (7) calmness immediately after the killing. State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000) (citations omitted). Although deliberation is no longer an element of first degree murder in Tennessee, the two elements were considered similar. See id. (factors used by the court were relevant to either premeditation, deliberation, or both).

Here, the evidence at trial, considered in a light most favorable to the State, presented at least five of the above factors from which the jury could infer premeditation. The proof indicates that Defendant procured and then used a deadly weapon on an unarmed victim. Since the murder weapon was not readily available, but stored in a purse in his parents' closet, Defendant had to purposefully locate the gun prior to shooting the victim. Tatrina was unarmed, and multiple wounds were inflicted upon her: three bullets were fired into her head at point blank range, and the autopsy revealed that she was probably also smothered during the encounter. Next, although attempts to conceal the body were not made, the evidence indicates that Defendant attempted to clean the murder weapon and returned it to the place he initially found it within twenty-four hours. The last factor, calmness after the crime, may be inferred from the testimony concerning Defendant's behavior. The day after the killing, the proof indicates that Defendant acted relatively normal: he went to school, prepared for the upcoming boxing competition, and even wept with the victim's family. Whether or not premeditation existed is a jury question, and Defendant has not met his burden of illustrating why the evidence is insufficient to support their conclusion regarding this matter. For the above reasons, Defendant is not entitled to relief on this issue.

## CONCLUSION

Accordingly, the judgment of the trial court is AFFIRMED.

_____
THOMAS T. WOODALL, JUDGE