IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 21, 2011 Session

## STATE OF TENNESSEE v. LORENZO McLEMORE, III, and MELISSA DENISE GAINES

Direct Appeal from the Criminal Court for Davidson County
No. 2009-B-1458     Cheryl Blackburn, Judge

No. M2010-01189-CCA-R3-CD - Filed February 6, 2012

The Defendant-Appellant, Lorenzo McLemore, III, was indicted by the Davidson County Grand Jury for three counts of attempted first degree murder, one count of especially aggravated burglary, and one count of employment of a firearm during the commission of a dangerous felony. During the first phase of McLemore's bifurcated trial, he was convicted of three counts of attempted voluntary manslaughter, a Class D felony, and the trial court declared a mistrial on the especially aggravated burglary count. During the second phase, the jury found McLemore guilty of employment of a firearm during the attempt to commit a dangerous felony, a Class C felony. The trial court imposed concurrent sentences of four years at thirty percent for the three convictions for attempted voluntary manslaughter and a consecutive sentence of six years at one hundred percent for the conviction for employment of a firearm during the attempt to commit a dangerous felony, for an effective sentence of ten years. On appeal, McLemore argues that the evidence was insufficient to support his conviction for employment of a firearm during the attempt to commit a dangerous felony and that the trial court committed plain error in bifurcating his trial. The other Defendant-Appellant, Melissa Denise Gaines, McLemore's mother, was indicted by the Davidson County Grand Jury for three counts of attempted first degree murder and employment of a firearm during the commission of a dangerous felony. She was subsequently found guilty of three counts of reckless endangerment, a Class A misdemeanor, and the trial court dismissed the firearm charge because the reckless endangerment convictions did not qualify as a dangerous felony for the firearm charge. Gaines argues on appeal that the evidence was insufficient to support her convictions for reckless endangerment. Upon review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

James O. Martin, III (on appeal) and Dumaka S. Shabazz (at trial), Nashville, Tennessee, for the Defendant-Appellant, Lorenzo McLemore, III.

Joe R. Johnson, II, Springfield, Tennessee, for the Defendant-Appellant, Melissa Denise Gaines.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy E. Wilber, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Bret T. Gunn, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

Initially, McLemore was charged with three counts of attempted murder and one count of employment of a firearm during the attempt to commit second degree murder, and Gaines was not charged. However, McLemore and Gaines were charged in a superseding indictment with three counts of attempted first degree murder, one count of especially aggravated burglary, and one count of employing a firearm during the commission of a dangerous felony.

At trial, Victor Chatman testified that McLemore shot him following an argument on the night of April 20, 2008. Chatman said that his aunt, Damara Pearson, and his cousins lived just down the street from McLemore's family. Earlier that day, Chatman's cousin, Steven Covington, had gotten into an argument with McLemore, who had drawn a gun on him. Chatman stated that Covington had called and asked him to try to "smooth things over" with McLemore. Chatman agreed, and he and Covington walked over to McLemore's home and knocked on the front door. McLemore answered the door, and Chatman asked him why he had produced a gun earlier. At that point, McLemore began cursing and shouting at them from the threshold of his home. Then McLemore's sister joined McLemore at the front door. McLemore's sister began "smacking" Steven Covington, and Covington responded by "smack[ing] her back." Chatman said that this altercation lasted around two to three minutes and concluded when Chatman's uncle, Anthony Covington, arrived and told him and Steven Covington to leave. Steven Covington complied, and Chatman remained on the porch a short time before returning to Pearson's home.

Chatman said that he was standing on Pearson's porch approximately ten minutes later when he saw McLemore's mother, Melissa Gaines, exit her car and begin screaming. At that point, Anthony Covington was inside Pearson's home and Steven Covington was "somewhere walking around the neighborhood." When Gaines got out of her car in her driveway, she had "her hand on the gun" and then gave the gun to McLemore. McLemore's

little brother told him to "cock it[,]" and McLemore began shooting. McLemore fired the first shot when he was on Chatman's neighbor's side of the duplex. Chatman said that he was hit by a bullet as he was standing on Pearson's porch. He also heard additional shots fired by McLemore but was unsure of the number. After getting shot, Chatman walked into the house, picked up one of his young cousins who was looking out the window, and moved her out of harm's way before he lost consciousness. He recalled seeing McLemore pointing the gun at the window as he moved his cousin away. He said that the next thing he remembered was when he awoke in the hospital. Chatman said that he never possessed a gun or threatened to use a gun during the incident. He also said that he never saw Steven Covington or Anthony Covington with a gun and never heard them threaten to use a gun during the altercation.

During cross-examination, Chatman admitted that he was in Hendersonville, Tennessee, when Steven Covington called him about McLemore. He also admitted that McLemore's porch, where the altercation took place, was very small and that Chatman, Covington, McLemore, and McLemore's sister were all very emotional during the incident. Chatman acknowledged that Steven Covington's slap to McLemore's sister was "open-handed" and forceful. When asked if he possessed a gun during this incident, Chatman responded that he "stayed around too many kids to be playing with guns."

During further cross-examination by Gaines's attorney, Chatman admitted that he had not been invited onto McLemore's property prior to the altercation. He also acknowledged that he did not immediately leave the property once the confrontation began. Chatman denied that he, Steven Covington, or Anthony Covington tried to gain entry into McLemore's house. Instead, he said that he told McLemore to come outside to talk.

Shatika Warfield testified that she lived "a street over" from the homes of McLemore and Pearson. Warfield stated that she saw McLemore and Steven Covington arguing in McLemore's yard several hours prior to the shooting. She later saw Chatman, Steven Covington, and Anthony Covington arguing with McLemore at McLemore's home. Warfield said that she told Chatman, Steven Covington, and Anthony Covington to go back to Pearson's house so they would stop arguing. She then saw Chatman, Anthony Covington, and Steven Covington return to Pearson's house. Around five minutes later, Warfield saw McLemore's mother, Melissa Gaines, arrive. She said that McLemore and the other people at his house walked outside and told Gaines about the argument with Chatman, Steven Covington, and Anthony Covington. She then heard McLemore's little brother tell McLemore to "cock it back" before McLemore started shooting. Warfield said that she did not see a gun prior to seeing McLemore fire the first shot. McLemore was in his own yard in front of the steps when he first started shooting, and she ran back to her house. She remembered McLemore firing a total of six shots. Warfield said that she never saw

Chatman, Anthony Covington, or Steven Covington with a gun and never heard any of these men threaten to use a gun.

During cross-examination, Warfield admitted that she was Steven Covington's girlfriend at the time of this incident. She said that there was an initial argument between Steven Covington and McLemore where Covington was in McLemore's yard. She also said that there was a second altercation where Anthony Covington, Steven Covington, and Chatman were on McLemore's porch. Warfield denied telling McLemore's investigator that Chatman had a gun the night of the altercation.

Steven Covington testified that he had known McLemore for two or three months at the time of the April 20, 2008 shooting. Covington said he had heard that McLemore was talking about him and had decided to confront McLemore. He first approached McLemore when his cousin, Victor Chatman, went with him to McLemore's porch. Covington said that McLemore's sister initially answered the door and then told McLemore to come to the door. He said that he, Chatman, and McLemore began arguing, and he threatened to fight McLemore. However, he denied threatening McLemore with a weapon. Covington said that when he told McLemore's sister to go get McLemore, she raised her arms, and because he thought she was going to hit him, he "smacked her." He stated that the argument ended when his uncle, Anthony Covington, walked over to McLemore's yard and told him and Chatman to leave. He also said that Anthony Covington did not argue with McLemore. Approximately ten to fifteen minutes after he left McLemore's porch and returned to Pearson's house, Gaines arrived. He saw Gaines give McLemore a black gun, and McLemore walked towards Pearson's house as he fired the gun. He also said that he heard more shots fired after he ran inside Pearson's house. Upon realizing that Chatman had been shot, he and his uncle rushed Chatman to the hospital. He said that the shooting had stopped when his uncle carried Chatman outside. Covington denied having a weapon at the time of the altercation with McLemore. He also denied that Anthony Covington and Chatman possessed a weapon or threatened to use a weapon during the incident.

During cross-examination, Steven Covington admitted that he asked Chatman to join him in order to confront McLemore about the things he had been saying about him. He also acknowledged that he was willing to fight McLemore. He agreed that his emotions were running high at the time that he confronted McLemore on the porch. However, he denied returning to McLemore's home after Anthony Covington told them to go back to Pearson's house. He also confirmed that McLemore never entered Pearson's home.

During cross-examination by Gaines's attorney, Steven Covington said that he told Chatman that McLemore had drawn a gun on him before they went over to McLemore's house. He again denied taking a gun to McLemore's home.

Anthony Covington testified that he was Steven Covington's uncle. He also stated that he was Damara Pearson's boyfriend. Anthony Covington said that he went to Pearson's home on April 20, 2008, when he left work. He was aware that there was a problem between Steven Covington and McLemore when he heard arguing while he was inside Pearson's house that evening. Originally, Steven Covington had gone over to McLemore's home to argue, and then Chatman arrived and went over to McLemore's house and joined the argument. Anthony Covington said he walked over to McLemore's home and told Steven Covington and Chatman to return to Pearson's house. He said that Chatman and Steven Covington were still arguing with McLemore as they walked back with him to Pearson's home. However, Anthony Covington denied arguing with McLemore that night. Shortly thereafter, he saw a car arrive but did not see anyone get out of the car. Then he heard gunshots five to eight minutes after returning to Pearson's home. Anthony Covington looked out the window and saw McLemore firing his gun and walking towards Pearson's home. He said that he heard eight to ten shots fired by McLemore. Anthony Covington denied having a weapon that night and stated that he never saw Chatman or Steven Covington with a weapon and never heard them threatening to use a weapon. He also stated that he never saw Gaines with a gun the night of the incident.

John Tuberville, a police officer with the Metro Nashville Police Department, testified that he responded to the April 20, 2008 shooting. He said that the initial report was a burglary in progress, but it was changed to a report that shots had been fired. During cross-examination, Officer Tuberville stated that the shots appeared to have been fired at McLemore's residence and had traveled to Pearson's home. Officer Tuberville said that he did not know whether the vehicle in which Chatman had been transported to the hospital had been searched for evidence.

Robert Hanson, a detective with the Metro Nashville Police Department, testified that he investigated the shooting in this case. On cross-examination, Detective Hanson said he remembered Steven Covington telling him that he and Chatman had left McLemore's porch one time before returning to McLemore's house.

Alex Brodhag, an agent with the Tennessee Bureau of Investigation's forensic science division, was declared an expert in firearms identification. Agent Brodhag testified that he examined the nine millimeter handgun found in McLemore's home as well as the eleven cartridge cases and five bullets found at the scene of the shooting. Upon examination, he concluded that the cartridge cases were fired from the nine millimeter handgun, but the five bullets, although possessing consistent rifling characteristics, did not contain enough individual detail on the surface for him to determine whether they were fired from the nine millimeter handgun.

Patrick Wells, a licensed private investigator hired by McLemore's attorney, testified that he interviewed Shatika Warfield over the telephone on April 17, 2009. Wells said that, during that conversation, Warfield informed him that someone other than McLemore had a gun the night of the shooting and that she believed the person with the gun was Victor Chatman. On cross-examination, Wells admitted that he did not record the statement Warfield gave to him on the telephone.

Defendant-Appellant, Lorenzo McLemore, testified about the events on April 20, 2008. He stated that his brother awoke him to tell him that Chatman was at the front door. McLemore said that, when he got to the door, he saw Chatman, Steven Covington, and Anthony Covington on the porch and that some people he did not know were with them. At that point, Chatman pointed a gun in his face and told him, "I heard you supposed [sic] to be shooting my cousin." McLemore said he told Chatman that he did not know what he was talking about. McLemore's sister walked to the door and informed the men that they needed to get out of their yard because she had just called the police. When Steven Covington tried to enter McLemore's house, McLemore and his sister pushed him back, and Steven Covington "smacked" McLemore's sister. Then McLemore and his sister closed the front door.

McLemore said that his sister had also telephoned his mother, who was driving home from the grocery store, about the altercation. He stated that Chatman, Steven Covington, and Anthony Covington and the other men stayed in his yard and were "kicking the door" and acting "rowdy." McLemore said that he was "scared for [his] life." Once his mother arrived home, McLemore and his sister went outside and met her. The crowd outside his house was still making threats as McLemore, his sister, and his mother walked into the house. He said the crowd was screaming, "[Y]ou come outside, we'll shoot you." At that point, McLemore's mother got her gun from upstairs, gave it to McLemore's sister, and called the police. The crowd continued to yell that they wanted to shoot him. McLemore said he took the gun from his sister. He opened the door and saw Chatman and Steven Covington walking towards his house. McLemore said either Chatman or Steven Covington "pulled the gun out, and that's when [he] started shooting." He was unsure whether Chatman or Steven Covington ever fired the gun. He asserted that he did not wait for them to fire the first shot because he had siblings in the house. When the crowd turned and ran back to Pearson's house, McLemore followed Chatman and continued to shoot at him. McLemore stated that "he just wanted to make sure [Chatman] got away from [his] house."

McLemore said that Steven Covington had been throwing rocks at McLemore's mother's car two days before the incident on April 20, 2008. There had been a fight between his younger brother and a relative of the Covingtons. He also said that he had seen Steven Covington with a gun at least one time prior to April 20. McLemore stated that the only

reason he fired the gun the night of the incident was to protect himself and his family. He said, "I didn't start nothing [sic]. They came to my house."

During cross-examination by Gaines's attorney, McLemore said that Melissa Gaines was his mother. He admitted that his mother never told him to shoot the gun the night of the incident and had actually tried to prevent him from going outside with the gun.

During cross-examination by the State, McLemore admitted that he had been charged with possession of a weapon as a juvenile. However, he claimed that he was charged because he was present in a car where a gun was found. He said the charge was ultimately dismissed.

McLemore acknowledged that he had given a statement regarding the April 20, 2008 incident to the police following his arrest. He said that his statement had been recorded on videotape, and he had watched it prior to trial. McLemore said he remembered telling the police that Anthony Covington had a gun the night of the incident but could not recall whether he had told them about Chatman also having a gun that night. In particular, McLemore could not remember whether he had informed the police during his statement that Chatman had pointed a gun in his face when he answered the door on April 20, 2008. However, he maintained that he had told the police about Chatman having a gun when they first arrived at the scene. McLemore stated that he also could not remember whether he told the police that someone was kicking his door after his mother arrived and before he took the gun and began shooting. After watching his taped statement, McLemore acknowledged that parts of his statement to the police varied from his testimony at trial. Most notably, he acknowledged that his statement asserted that Anthony Covington had the gun while his testimony at trial was that Chatman was the individual who pointed a gun in his face. In addition, McLemore acknowledged that during his statement he told law enforcement that he did not wait for the police to arrive the night of the incident because the police had been called several times and he was getting tired of the crowd threatening to shoot him. However, McLemore testified that he walked outside and began shooting because he was afraid for his life.

Defendant-Appellant, Melissa Gaines, testified that she received several phone calls from her older daughter the night of April 20, 2008. During these conversations, she told her daughter three times to call the police. Gaines said that she also called the police. During one of the telephone calls, her daughter informed her that she and McLemore "were being bullied and picked on, and someone was trying to break into [their] house." In a later phone call, her daughter told her that these individuals had a gun. After receiving these calls, Gaines drove home. Gaines said that she was on the telephone with the police until she entered her home. When she arrived, Gaines saw a crowd of people in her yard. She said her children met her at the door and told her what had been happening. Gaines said that her

older daughter informed her that she had been hit by Steven Covington and that McLemore told her that Chatman had a gun. At that point, Gaines said that Chatman and Steven Covington were still at her front door. Gaines told Steven Covington and Chatman that they needed to leave and told her children to come inside the house.

Once her family was inside the home, Gaines said she loaded her handgun and talked to her children. She looked at her older daughter's knot on her head and her younger daughter's black eye. She said McLemore went back outside to argue with Chatman and Covington but came inside shortly thereafter. Gaines said she could see Chatman standing beside her window. While she was looking at her children's injuries, Gaines placed her gun on an entertainment center. At that point, McLemore came back inside the home, grabbed the gun, and walked back outside. Gaines said that she screamed at McLemore to stop. She then heard shots fired. Gaines denied telling McLemore to get the gun and begin shooting at the people outside. She said that she had the gun for her protection and maintained that she never fired the gun the night of April 20, 2008.

During cross-examination by the State, Gaines denied being angry during her 911 call. Instead, she claimed that she was upset because her children were being threatened and her daughter had been hit. She acknowledged telling the 911 dispatcher that the men at her house had a gun and that she also had a gun. Gaines said that when she arrived home, she put her unloaded gun in a bag, brought it into the house, and loaded it upstairs. Gaines's 911 call was played to the jury.

John Reynolds, a dispatcher for the Metro Nashville Emergency Communication Center, testified that Gaines called 911 at 8:20 p.m. on April 20, 2008. He said that Gaines's 911 call lasted five minutes and twenty seconds. Reynolds also stated that a second 911 call was placed at 8:22 p.m. by an unidentified female claiming that she had been assaulted. At 8:27 p.m., a third 911 call came in from an individual complaining of shots being fired in the neighborhood where this incident occurred.

## ANALYSIS

**I. Sufficiency of the Evidence.** McLemore argues that the evidence at trial was insufficient to support his conviction for employment of a firearm during the attempt to commit a dangerous felony. Gaines contends that the evidence at trial was insufficient to support her convictions for reckless endangerment.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the

-8-

light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. <u>State v. Matthews</u>, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing <u>State v. Brown</u>, 551 S.W.2d 329, 331 (Tenn. 1977); <u>Farmer v. State</u>, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. <u>State v. Odom</u>, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." <u>Henley v. State</u>, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." <u>Bland</u>, 958 S.W.2d at 659 (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." <u>Id.</u> (citing <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982)).

**A.  Lorenzo McLemore, III.** McLemore argues that the evidence at trial was insufficient to support his conviction for employment of a firearm during the attempt to commit a dangerous felony. He contends that "the sufficiency of the convicting evidence should be weighed in terms of the first" phase of the trial and "[w]hen viewed in this regard, the jury would have been presented with the charge for this offense at the same time as the charge for the others." McLemore also argues that the State should have been required to elect the "dangerous felony" upon which it was relying during the first phase. He further contends that the superseding indictment and the State's closing argument show that "the State was not relying on attempted voluntary manslaughter as the dangerous felony element of the offense." Moreover, he asserts that the State presented no proof regarding the offense of especially aggravated burglary during the first trial, and since this was the dangerous felony offense upon which the State would have had to rely if the trial had not been bifurcated, the lack of proof on the especially aggravated burglary precluded a finding of guilt regarding the firearm offense. On this basis, he argues that his conviction for employing a firearm during the attempt to commit of a dangerous felony must be reversed and that this count of the indictment must be dismissed.

In response, the State contends that the evidence was more than sufficient to support this conviction. Specifically, the State asserts that McLemore never denied using a weapon during the offense of attempted voluntary manslaughter and that the jury rejected McLemore's claim of self-defense.

We agree that the trial should not have been bifurcated and that the jury should have been charged with the firearm offense at the same time as the attempted first degree murder and lesser included offenses in this case. See T.C.A. § 39-17-1324(d) (Employment of a firearm during the commission of or attempt to commit a dangerous felony "is a specific and separate offense, which shall be pled in a separate count of the indictment or presentment and tried before the same jury and at the same time as the dangerous felony.") (emphasis added). Although the bifurcation of the trial was error, we do not conclude that it constitutes plain error, as we will explain later. We also conclude that any issue regarding the State's failure to elect the dangerous felony upon which it relied for the firearm charge is moot, given that the court's instruction to the jury regarding the firearm offense ensured a unanimous verdict.

Employing a firearm during an attempt to commit a dangerous felony is a Class C felony. Id. § 39-17-1324(b)(2), (h)(1). Attempted voluntary manslaughter is defined as a dangerous felony pursuant to section 39-17-1324. Id. § 39-17-1324(i)(1)(C), (i)(1)(M). Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Id. § 39-13-211.

We conclude that there was sufficient evidence to support McLemore's conviction for employment of a firearm during the attempt to commit voluntary manslaughter. Chatman testified that he was hit by one of McLemore's bullets as he was standing on Pearson's porch the night of April 20, 2008, after he and Steven Covington had gotten into an argument with McLemore. He saw Gaines hand the gun to McLemore and then saw McLemore begin shooting. Chatman said that although he was unsure of the number, McLemore fired several shots during the incident. Chatman said that neither he, nor Steven Covington, nor Anthony Covington had a gun or threatened to use a gun the night of the incident. He also denied trying to gain entry into McLemore's house the night of the argument. Warfield similarly testified that she observed McLemore firing the handgun after having an argument with Chatman, Steven Covington, and Anthony Covington. Warfield confirmed that she never saw Chatman, Steven Covington, or Anthony Covington with a gun and never heard any of these men make any threats about using a gun.

Steven Covington also testified that he saw Gaines give McLemore a gun before McLemore began shooting. Although Steven Covington admitted that he was willing to fight McLemore, he denied ever threatening McLemore with a weapon. He said that the argument with McLemore ended when Anthony Covington told him and Chatman to return to Pearson's house. In addition, Anthony Covington testified that he saw McLemore fire eight to ten shots the night of April 20, 2008. Most importantly, McLemore acknowledged that he took Gaines's handgun and "started shooting" after having a heated argument with Chatman, Steven Covington, and Anthony Covington. Although McLemore presented a theory of self-defense at trial, it was the jury's prerogative to reject this theory and to credit

the testimony of Chatman, Steven Covington, Anthony Covington, and Warfield over the testimony of McLemore and Gaines. See Odom, 928 S.W.2d at 23. Accordingly, McLemore is not entitled to relief on this issue.

**B. Melissa Denise Gaines.** Gaines contends that the evidence at trial was insufficient to support her convictions for reckless endangerment. Specifically, Gaines argues that she loaded her registered gun for the protection of herself and her family. She argues that she never gave the gun to her son, McLemore, or assisted or encouraged him in any way during the shooting. In addition, Gaines argues that both she and McLemore testified at trial that she did not tell her son to pick up the gun and start shooting at the victims and that she tried to stop McLemore from shooting anyone. She asserts that the only individuals who testified that she handed the gun to McLemore were Chatman and Covington, the men she claimed started the argument at issue in this case. In response, the State argues that the evidence was sufficient to support the convictions for reckless endangerment, given Gaines's inculpatory statements to the 911 dispatcher, the timing of the 911 calls, and Chatman and Steven Covington's testimony that they observed Gaines give the gun to McLemore before he began shooting at the victims.

A person commits the offense of reckless endangerment when he or she "engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." Id. § 39-13-103(a). Reckless endangerment is a Class A misdemeanor. Id. § 39-13-103(b). At trial, the State presented sufficient evidence for the jury to find that Gaines was guilty of reckless endangerment under a theory of criminal responsibility. An individual is criminally responsible for the conduct of another person if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Id. § 39-11-402(2). Criminal responsibility is not a distinct crime but "a theory by which the state may prove the defendant's guilt based on another person's conduct." State v. Osborne, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (citing State v. Mickens, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)). Pursuant to the theory of criminal responsibility, "an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime can be inferred." State v. Watson, 227 S.W.3d 622, 639 (Tenn. Crim. App. 2006) (citing State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998)). Under this theory, "no particular act need be shown, and the defendant need not have taken a physical part in the crime to be held criminally responsible." Id. (citing Ball, 973 S.W.2d at 293). In order to be held criminally responsible for the acts of another, the defendant must "'in some way associate himself with the venture, act with the knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976) (quoting Jenkins v. State, 509 S.W.2d 240, 244-45 (Tenn. Crim. App. 1974)). Additionally, there is no requirement that the State "elect

between prosecution as a principal actor and prosecution for criminal responsibility." State v. Hodges, 7 S.W.3d 609, 625 (Tenn. Crim. App. 1998) (citing State v. Williams, 920 S.W.2d 247, 257-58 (Tenn. Crim. App. 1995)).

We conclude that the evidence was sufficient to convict Gaines of three counts of reckless endangerment. In the 911 call played for the jury, Gaines told the dispatcher: "If I catch [Steven Covington] in [my house], y'all gonna have to bring the ambulance to pick him up." She also told the dispatcher that she had a gun at her house. Just prior to hanging up, Gaines informed the dispatcher that she would be arriving at home in three minutes. John Reynolds, the 911 dispatcher, testified during rebuttal that Gaines first called 911 at 8:20 p.m. on April 21, 2008, and that this call lasted five minutes and twenty seconds. Reynolds said that another 911 call came in at 8:27 p.m. from an unidentified individual complaining of gunshots being fired in the area of McLemore's house.

We agree with the State that the conclusion of Gaines's phone call at 8:25 p.m. and the 8:27 p.m. call regarding gunshots are at odds with Gaines's testimony that she arrived home, talked to her children about the details of the argument, told Chatman and Steven Covington to go home, told her children to come inside the house, walked upstairs to load her gun, placed her gun on the entertainment center, and checked on her daughters' injuries before McLemore took the gun off of the entertainment center, walked outside, and began firing as she was screaming at him to stop. In sharp contrast to Gaines's version of events, Chatman and Steven Covington testified that they saw Gaines arrive at home and immediately give her loaded gun to McLemore before McLemore began shooting. Ultimately, the jury chose to credit the testimony of Chatman and Steven Covington over the testimony of Gaines regarding her involvement in the shooting. As we previously stated, this court will not "reweigh or reevaluate the evidence." Henley, 960 S.W.2d at 578-79. Accordingly, Gaines is not entitled to relief.

**II. Bifurcation of McLemore's Trial.** McLemore contends that the trial court erred in bifurcating his trial. In response, the State argues that McLemore waived this issue. Moreover, the State argues that McLemore failed to establish that he is entitled to plain error review. See State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000); Tenn. R. App. P. 36(b). Finally, the State contends that despite McLemore's arguments to the contrary, the bifurcated trial made an election of offenses regarding the dangerous felony unnecessary, did not violate his double jeopardy protections, and did not violate his right to a jury trial.

We agree with the State that McLemore waived this issue because the limited record on appeal shows that McLemore agreed to, or at least did not oppose, bifurcation. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

At the point that the jury began deliberating on the three counts of attempted first degree murder and especially aggravated burglary, the trial court asked the State if it was going to put on any proof in the second phase of the trial regarding the charge of employment of a firearm during the commission of a dangerous felony. The State responded that it would not present any proof and would simply read the indictment and make a short closing argument. McLemore's attorney also stated that he would not present any proof. The jury subsequently found McLemore guilty of three counts of attempted voluntary manslaughter against Steven Covington, Victor Chatman, and Anthony Covington. Because the jury was unable to reach a verdict on the especially aggravated burglary charge, the trial court ultimately declared a mistrial as to that count. The jury also found Gaines guilty of three counts of reckless endangerment against Steven Covington, Victor Chatman, and Anthony Covington. The court then informed the jury that there was "another matter" that needed to be taken up outside the jury's presence. Once the jury left the courtroom, the trial court informed Gaines that she would now be found not guilty of count five, the firearm offense, because reckless endangerment was not considered a dangerous felony under section 39-17-1324(i)(1). The court informed the jury, upon their reentry into the courtroom, that there was a fifth count of the indictment charging McLemore with employing a firearm during the commission of a dangerous felony and that their guilty verdicts for attempted voluntary manslaughter constituted a dangerous felony for the purposes of that offense. The trial court said that the jury would now have to determine if McLemore employed a firearm during the commission of a dangerous felony. The court added that because the jury had found Gaines guilty of reckless endangerment, which was not defined as a dangerous felony, it would not have to determine whether she employed a firearm during the commission of a dangerous felony. The State then read count five of the indictment, and McLemore entered a plea of not guilty to this charge. The State informed the court that it did not have any additional proof but asked that the proof presented in the first phase of the trial be considered by the jury. McLemore's attorney stated that he had no additional proof to present. The State and defense counsel then gave short arguments regarding this charge before the trial court presented the following supplemental charge to the jury regarding count five:

> Members of the jury, you have determined that the defendant, Lorenzo McLemore[,] III, is guilty of attempted voluntary manslaughter in Counts 1, 2, and 3. It will now be your duty to determine whether or not the defendant is guilty of employing a firearm during the commission of or attempt to commit a dangerous felony as charged in Count 5 of the indictment. For you to find the defendant guilty of this offense the State must have proven beyond a reasonable doubt the existence of the following essential elements.
>
> (1) that the defendant employed a firearm[;] and[]

-13-

(2) that the employment was during the commission of or attempt to commit a dangerous felony, attempted voluntary manslaughter; and

(3) that the defendant acted either intentionally, knowingly, or recklessly.

The definition of attempted voluntary manslaughter was previously defined for you in the main charge. Please refer to that definition as you deem it necessary and appropriate to do so. Dangerous felony is defined in [Tennessee Code Annotated] section 39-17-1324[(i)(1)]. Attempted voluntary manslaughter is included in the definition of dangerous felony. Therefore[,] attempted voluntary manslaughter is a dangerous felony.

At the motion for new trial hearing, defense counsel argued that it was "unfair" for the State to use the attempted voluntary manslaughter convictions as the dangerous felony for the firearm offense when the especially aggravated burglary charge ended in a mistrial. The State responded that there was nothing in the statute to preclude it from charging the firearm offense without the especially aggravated burglary offense since certain lesser included offenses for attempted first degree murder could constitute a dangerous felony. The trial court then asked defense counsel, "Why didn't you make this rather unusual argument pretrial?" The court then stated that "we bifurcated" the trial "so that if the jury came back with attempted first degree murder [the charge of employment of a firearm during the commission of a dangerous felony] would be a moot point." The court also asserted that defense counsel "never objected to the way we did it." Ultimately, the trial court denied the motion on the basis that the issue should have been presented by the defense before trial.

McLemore raised the bifurcation issue for the first time in his motion for new trial and, based on the record on appeal, failed to object to the bifurcation of his trial prior to or during trial. As we previously discussed, McLemore was required "to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." See Tenn. R. App. P. 36(a). Here, the harmful effect of the alleged error could have been prevented if McLemore had made a contemporaneous objection to the bifurcation of his trial. Accordingly, this issue is waived. See State v. Tune, 872 S.W.2d 922, 930 (Tenn. Crim. App. 1993) ("A party cannot witness misconduct on the part of the court, await the result of the verdict, and then, if it is against him or her, object to the alleged misconduct.").

Waiver notwithstanding, we also agree with the State that McLemore failed to meet all five of the requirements for plain error review. In State v. Adkisson, this court stated that in order for an error to be considered plain:

(a) the record must clearly establish what occurred in the trial court;

-14-

(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is "necessary to do substantial justice."

899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted). All five factors must be shown, and it is not necessary to consider every factor if it is obvious that one of the factors cannot be established. Smith, 24 S.W.3d at 282-83.

We decline to grant relief on this issue because McLemore has not established that a substantial right was adversely affected, that he did not waive the issue for tactical reasons, or that consideration of the error is necessary to do substantial justice. See Adkisson, 899 S.W.2d at 641-42. This court has stated that plain error "must be of such a great magnitude that it probably changed the outcome of the trial." Id. at 642. We conclude that the trial court's error regarding bifurcation did not affect the outcome of the trial. We further conclude, based on the same analysis, that McLemore is not entitled to relief on his claims that the bifurcation relieved the State from making an election of offenses regarding the dangerous felony upon which it would rely, violated his double jeopardy protections, or violated his right to a jury trial.

## CONCLUSION

We conclude that the evidence was sufficient to support McLemore's conviction for employment of a firearm during the attempt to commit a dangerous felony and Gaines's convictions for reckless endangerment. We further conclude that the trial court did not commit plain error in bifurcating McLemore's trial and that McLemore is not entitled to relief on his claims that the bifurcation relieved the State from making an election of offenses, violated his double jeopardy protections, or violated his right to a jury trial. Upon review, the judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE